IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF PHILADELPHIA; CHERELLE PARKER, Mayor of Philadelphia, in her official capacity; LAWRENCE KRASNER, District Attorney of Philadelphia, in his official capacity; RENEE GARCIA, City Solicitor of Philadelphia, in her official capacity,<br><br>Defendants. | Case No.: 2:26-cv-4208 |

**DECLARATION OF JOHN RIFE**

I, John Rife, declare the following under 28 U.S.C. § 1746, and state that under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1.      I am the Acting Field Office Director ((A)FOD) for the U.S. Department of Homeland Security (DHS), United States Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations (ERO) Philadelphia Field Office in Philadelphia, PA (ERO Philadelphia). I have served in this capacity since February 22, 2026. I have been employed by ICE ERO in various roles since 2003, having last been promoted to Deputy Field Office Director for ERO Philadelphia in 2025.

2.      As (A)FOD, my responsibilities include the management of all ERO personnel within the ERO Philadelphia area of responsibility (AOR), which encompasses the states of Pennsylvania, Delaware, and West Virginia. I further provide oversight of all case management and detention operations within the AOR in compliance with federal law and applicable policies,

1

including domestic transportation, detention, alternatives to detention programs, bond management, supervised release, and the removal of aliens subject to final orders of removal to more than 170 countries around the world.

3.      I hereby submit this declaration in support of Plaintiff's Preliminary Injunction in the above captioned case.

4.      The statements contained in this declaration are based upon my personal knowledge, reasonable inquiry, and information made available to me in the course of my official duties from information obtained from records, systems, databases, other DHS employees, and/or information portals maintained and relied upon by DHS.

## BACKGROUND

5.      ICE is the largest investigative branch of DHS and is charged with enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001, terrorist attacks, by combining components of the former Immigration and Naturalization Service and the former U.S. Customs Service, among other agencies, to more effectively enforce federal immigration and customs laws and to protect the United States against terrorist attacks. The mission of ICE is to protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats. ICE consists of three core operational directorates: (1) ERO, which includes 25 field offices led by FODs; (2) Homeland Security Investigations (HSI), which includes 30 field offices led by Special Agents-in-Charge; and (3) the Office of the Principal Legal Advisor, which has offices in 130 locations throughout the United States and at ICE Headquarters.

6.      ERO deportation officers are immigration officers under 8 U.S.C. § 1357 and

customs officers under 19 U.S.C. § 1589a. It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally—including those who cross the border illegally, which is a federal misdemeanor, 8 U.S.C. § 1325, and those who illegally reenter after having been removed, which is a federal felony, 8 U.S.C. § 1326—or otherwise undermine the integrity of our immigration laws and our border control efforts.

7.      The majority of ERO's immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, initiating removal proceedings, and, when appropriate, detaining aliens during removal proceedings or if they are subject to a final order of removal, until their removal from the United States. ERO's enforcement activities include locating and taking into custody fugitive aliens and at-large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails, and working with those authorities to transfer such aliens to ICE custody without releasing them into the community. When aliens are ordered removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

8.      As the (A)FOD for ERO Philadelphia, I, through subordinate managers, oversee all enforcement, detention, and removal operations in ERO Philadelphia AOR, including the Criminal Alien Program (CAP) and the Fugitive Operations Program (FOP).

9.      The CAP focuses on identifying, arresting, and removing criminal aliens incarcerated in federal, state, county, or local detention facilities. CAP safely transfers these individuals into federal custody, reducing the risk to the public. Additionally, under The Laken Riley Act of 2025, ICE is required to take into custody aliens who commit certain acts in the United States. Pub. L. No. 119-1, 139 Stat 3.

10. The FOP locates and arrests at-large aliens who are not in law enforcement custody and pose a threat to national security or public safety, have entered the United States illegally or unlawfully remained in the United States without authorization, have been found to be in violation of immigration law, are subject to orders of removal, or undermine immigration laws and border control.

11. ERO traditionally partners with other law enforcement agencies to ensure community safety, enhancing its ability to arrest, and remove criminal and fugitive aliens.

## PHILADELPHIA CITY COUNCIL BILL 260060 (CB 260060)

12. On April 23, 2026, the Philadelphia City Council passed CB 260060, which added §§ 10-843, 10-844, 10-845, 10-846 to the Philadelphia Code. CB 260060 was passed, despite not being signed by Mayor Parker, and became law on May 8, 2026 pursuant to the Philadelphia Home Rule Charter, which provides that a city bill shall pass without a mayoral signature unless she disapproves it.

13. Section 10-843(2) prohibits federal law enforcement officers from wearing facial coverings while engaged in the performance of official duties.

14. Section 10-844 contains an identification requirement which requires a law enforcement officer to visibly display a badge or insignia bearing the officer's name or other unique individual identifier and the name of the law enforcement agency that employs the officer. Vehicles must also contain clear identifying information for the entity that employs the law enforcement officer.

15. Officers are also required to identify themselves to subjects of arrest, holding, or detention, or upon request.

16. A violation of these sections imposes criminal and civil penalties unless the law

4

enforcement agency that employs the violative officer adopts and establishes a written policy regarding the use of facial coverings and other identification standards as listed in the Bill. The Bill also authorizes the District Attorney to investigate and criminally prosecute facial coverings, failure to identify, and improper vehicle identification incidents involving federal officers. The Bill provides a private right of action by the City Solicitor and private parties to seek civil penalties from the officer's employing agency for any such violations by the officer.

17.     The Bill goes into effect on July 7, 2026.

## PROTECTING OFFICERS' PERSONAL IDENTITIES IS CRITICAL FOR OFFICER SAFETY AND OPERATIONAL EFFECTIVENESS

18.     Protecting federal immigration officers' personal identities during enforcement operations is a critical tool serving vital safety and operational purposes. Protecting the personal identities of federal officers and their families is more urgent today in part due to the increasingly common threats of targeted harassment of and retaliation against federal immigration officers for simply doing their jobs.

19.     Individuals, including immigration activists and other members of the public, routinely photograph, film, and publish online ICE ERO enforcement actions to include the personal identities of ICE officers and other federal task force personnel, as well as information regarding the vehicles used by ICE officers, including the make and model and license plate numbers. The photographs and films are posted online for the sole purpose of intimidating and harassing government employees and are directly used by members of local organized crime and transnational criminal organizations in serious and potentially deadly ways.

20.     During enforcement actions, ICE personnel regularly observe and overhear individuals shouting phrases such as "doxx these people," "find out who they are and where they

live," and "we will find out who you are and who your family members are."

21.    ICE officers are seeing a 1000% increase in assaults and an 8000% increase in death threats from groups such as rioters, illegal aliens, highly sophisticated gangs who are enforcement targets, criminal rings, murders, and rapists.

22.    DHS has obtained credible intelligence indicating that Mexican criminals, in coordination with domestic extremist groups, have placed targeted bounties for the murders of ICE and U.S. Customs and Border Patrol (CBP) personnel in a tiered bounty system. Cartels have disseminated a structured bounty program to incentivize violence against federal personnel, with payouts escalating based on rank and action taken: (1) $2,000 for gathering intelligence or doxxing officers (including photos and family details); (2) $5,000–$10,000 for kidnapping or non-lethal assaults on standard ICE/CBP officers/agents; and (3) up to $50,000 for the assassination of high-ranking officials.

23.    Protesters have presented other safety threats including blocking traffic in and around hotels at which officers and agents are staying, unleashing a barrage of honking at all hours of the day and night, and in one instance, slashing the tires of an unmarked government vehicle parked at the hotel parking lot.

24.    Doxxing of ICE officers/agents has also been encouraged across the internet. Some examples of websites perpetrating the doxxing of ICE staff, including contractors are ICESpy.org, ICEList.is, and ICEList.info. During protests at ICE offices, there have been numerous attempts by activists, protesters, and agitators to identify and dox our staff as they enter and exit federal properties. In addition, it is a regular occurrence for members of the public to interfere with and attempt to document the activities and identities of our officers conducting field operations.

25.    Some individuals are taking pictures of ICE officers' faces and running those

pictures through facial recognition applications that will search all of social media. Once a match is made, they will continue to search for family members, including children. Once all the family members are identified, they'll attempt to locate the family's home. The findings are posted on anti-ICE websites.

26. Wearing facial coverings or otherwise protecting the personal identities of immigration officers can be essential to mitigating the above kinds of threats. That is, facial coverings reduce the risk of officers' personal identities being shared publicly, which helps ensure that officers' privacy and safety, and that of their family members, remains intact. Protecting officers' personal identities is particularly important during high-risk enforcement operations involving individuals with violent criminal history, including gang affiliations, or who are associates or members of transnational criminal organizations or known or suspected terrorists or human rights violators.

27. Facial coverings are also an important tool to protect officers from unpredictable health and safety hazards that arise during enforcement activities. Wearing facial coverings can minimize exposure to these, and other types, of health hazards. ICE officers should therefore have the ability to prepare themselves for these hazards at any time during any law enforcement operation, irrespective of whether the operation is an active undercover operation, a tactical operation, or whether an operation is occurring in exigent circumstances. Moreover, ICE policy permits personnel to use any facial covering they feel is appropriate to meet operational needs and to protect them from health hazards.

28. In addition to mitigating safety risks, protecting the personal identities of federal immigration officials is necessary for operational purposes to effectively accomplish DHS's immigration enforcement mission.

29. For instance, ICE routinely conducts investigations and surveillance in plain clothes to locate and apprehend illegal aliens, particularly in public or community areas where targets may attempt to evade detection. Philadelphia's attempt to require ICE officers and agents to wear visible identification including a name tag or badge would compromise operational security by alerting targets to the presence of law enforcement, thereby increasing the likelihood of flight, heightening the potential for volatile and dangerous confrontations.

30. The visible identification requirement of the officers to the public and subjects of arrest, holding, or detention, as well as requiring vehicle identification would therefore undermine ICE's ability to apprehend individuals who pose significant risks to national security and public safety, which further jeopardizes the safety of officers, the public, and targets themselves.

31. Facial coverings also prevent suspects from identifying officers who may be involved in future enforcement actions. Because suspects who recognize officers may take preemptive actions to evade apprehension and obstruct enforcement efforts, wearing facial coverings is critical for maintaining operational effectiveness, especially in areas where repeat offenders or organized criminal networks are prevalent.

32. Given the personal threats and violence that ICE officers/agents face, denying them the opportunity to protect their identities by not displaying their names and wearing facial masks would chill federal law enforcement operations. Moreover, the threat of a state criminal prosecution will also chill officers and thus federal operations.

33. The inability to conceal officers' identities during enforcement actions thus compromises DHS's mission and increases the likelihood of targeted violence against its officers and agents.

34. Collectively, these measures severely constrain ICE's ability to protect

communities within the City and County of Philadelphia and undermine the effectiveness of federal immigration enforcement in not only Philadelphia, but the surrounding region at large.

35.    CB 260060's provisions on facial coverings and identification hinder ICE's ability to conduct efficient and effective immigration enforcement within Philadelphia.

36.    This declaration is based upon my personal knowledge and information made available to me in my official capacity. I provide this declaration based on the best of my knowledge, information, belief, and reasonable inquiry for the above captioned case. If called upon to testify, I could and would do so.

Executed this 18th day of June 2026.

John Rife
Acting Field Office Director
Enforcement and Removal Operations
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security

9