David L. Axelrod, ID 323792
Facundo Bouzat, ID 335101
J. Chesley Burruss, ID 331521
**BALLARD SPAHR LLP**
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: 215.665.8500
Facsimile: 215.864.8999

*Attorneys for Defendants*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | Case No. 2:26-cv-4208 |
| Plaintiff, | **DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | |
| CITY OF PHILADELPHIA; CHERELLE PARKER, Mayor of Philadelphia, in her official capacity; LAWRENCE KRASNER, District Attorney of Philadelphia, in his official capacity; RENEE GARCIA, City Solicitor of Philadelphia, in her official capacity, | |
| Defendants. | |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION .................................................................................................... 1

II.   BACKGROUND ..................................................................................................... 2

    A.    The Bill Protects Communities and Law Enforcement ............................. 2

    B.    DOJ Filed this Lawsuit Before the Bill Took Effect and Before It
        Was Clear How the City Would Enforce the Bill ....................................... 5

III.  LEGAL STANDARDS ........................................................................................... 5

IV.   THE FEDERAL GOVERNMENT IS NOT LIKELY TO SUCCEED ON
    THE MERITS OF ITS CLAIMS ............................................................................. 7

    A.    This Courts Lacks Jurisdiction Because the Federal Government
        Lacks Article III Standing to Sue in the Pre-enforcement Context ............ 7

    B.    The Bill Does Not Trigger the Intergovernmental Immunity
        Doctrine .................................................................................................... 11

    C.    The Federal Government Cannot Satisfy the Standard for Bringing
        a Facial Challenge to the Bill Based on Hypothetical Circumstances
        .................................................................................................................. 18

V.    THE FEDERAL GOVERNMENT WILL NOT SUFFER IRREPARABLE
    HARM ................................................................................................................... 19

VI.   THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FAVOR
    DENYING A PRELIMINARY INJUNCTION ..................................................... 22

VII.  CONCLUSION ...................................................................................................... 24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Freedom Forge Corp.*,
204 F.3d 475 (3d Cir. 2000)........................................................................................................20

*Benezet Consulting LLC v. Sec'y Commonwealth of Pennsylvania*,
26 F.4th 580 (3d Cir. 2022) ........................................................................................................18

*Campbell Soup Co. v. ConAgra, Inc.*,
977 F.2d 86 (3d Cir. 1992)..........................................................................................................20

*Checker Cab of Phila. Inc. v. Uber Techs., Inc.*,
643 F. App'x 229 (3d Cir. 2016) ...................................................................................................6

*CoreCivic, Inc. v. Gov. of N.J.*,
145 F.4th 315 (3d Cir. 2025) ...........................................................................................12, 14, 15

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
108 F.4th 194 (3d Cir. 2024) ....................................................................................................6, 23

*Doe ex rel. Doe v. Boyertown Area Sch. Dist.*,
897 F.3d 518 (3d Cir. 2018)...........................................................................................................6

*Doe v. Reed*,
561 U.S. 186 (2010)......................................................................................................................18

*ECRI v. McGraw-Hill, Inc.*,
809 F.2d 223 (3d Cir. 1987)..........................................................................................................20

*Ferring Pharms, Inc. v. Watson Pharms., Inc.*,
765 F.3d 205 (3d Cir. 2014)...........................................................................................................6

*Garrett v. PennyMac Loan Servs.*,
No. 3:18-CV-00718, 2018 WL 2981266 (M.D. Pa. June 14, 2018)............................................19

*Hancock v. Train*,
426 U.S. 167 (1976)................................................................................................................13, 14

*Johnson v. Maryland*,
254 U.S. 51 (1920)..........................................................................................................13, 15, 16

*Joint Stock Soc'y v. UDV N. Am., Inc.*,
266 F.3d 164 (3d Cir. 2001)............................................................................................................7

*Maryland v. King*,
567 U.S. 1301 (2012)................................................................................................23

*Nat'l Shooting Sports Found. v. Att'y Gen. of New Jersey*,
80 F.4th 215 (3d Cir. 2023) ............................................................... *passim*

*Nken v. Holder*,
556 U.S. 418 (2009)................................................................................................6, 22

*Patel v. Glenn*,
No. 21-3499, 2022 WL 16647974 (6th Cir. Nov. 3, 2022) ................................................19, 20

*Planned Parenthood League v. Bellotti*,
641 F.2d 1006 (1st Cir. 1981)................................................................................................18

*Reilly v. City of Harrisburg*,
858 F.3d 173 (3d Cir. 2017)................................................................................................6

*Roe v. Fauver*,
No. CIV. 88-1225 (AET), 1988 WL 47359 (D.N.J. May 13, 1988) ......................................20

*Surman v. UPMC Presbyterian Shadyside*,
No. CV 17-184, 2018 WL 4901107 (W.D. Pa. Oct. 9, 2018) ......................................9

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)................................................................................................7

*Trump v. New York*,
592 U.S. 125 (2020)................................................................................................7

*United States v. California*,
173 F.4th 1060 (9th Cir. 2026) ................................................................15, 16, 17

*United States v. California*,
921 F.3d 865 (9th Cir. 2019) ................................................................22

*United States v. City of Arcata*,
629 F.3d 986 (9th Cir. 2010) ................................................................15, 16

*United States v. Cuevas-Almonte*,
156 F.4th 319 (3d Cir. 2025) ................................................................19

*United States v. Maury*,
695 F.3d 227 (3d Cir. 2012)................................................................................................17

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)................................................................................................5, 6, 22

**Ordinances**

Phila. City Council Bill No. 260060 (2026) ............................................................ *passim*

**Other Authorities**

8 C.F.R. § 287.8 ..........................................................................................................21

NBC News, *Fake ICE agents terrorize immigrants amid Trump's crackdown*
     (May 25, 2026), https://www.nbcnews.com/news/us-news/ice-impersonators-
     immigrants-raids-violence-trump-administration-rcna265653 .............................2, 3

## I.   INTRODUCTION

Community members and law enforcement personnel are both safer when people can ascertain that individuals engaged in law enforcement activity are affiliated with law enforcement. Implementing this basic precept, the City of Philadelphia enacted Bill No. 260060 ("the Bill") to protect public safety and ensure that community members can distinguish law enforcement officers from criminals and vigilantes. It aims to ameliorate the confusion and fear created by the activity of anonymous law enforcement agents and to restore public trust and accountability to law enforcement operations: "In order to properly protect people living in the City of Philadelphia, ensure transparency and accountability for local, state, and federal law enforcement, Council finds that the [Bill] is necessary to the jurisdiction's safety and democracy." Compl., Ex. A, § 1(4), ECF No. 1-2 ("Ex. A"). The federal government's lawsuit challenges the constitutionality of the Bill and seeks to enjoin certain of its provisions.

The Court should deny the federal government's motion for a preliminary injunction for several reasons. First, the federal government's claims are unlikely to succeed on the merits. As a preliminary matter, this Court lacks jurisdiction under Article III of the Constitution because the federal government does not have standing to sue in the pre-enforcement context. Pre-enforcement review, as the Third Circuit has often stated, is the exception rather than the rule and only available where a credible and immediate threat of enforcement exists. The federal government cannot meet this standard. The federal government's claims fail on the substance, too, because the Bill does not directly interfere with the federal government's functions. Rather, the Bill imposes at most an incidental burden on federal law enforcement. And even if there were hypothetical instances where the Bill could be subject to a legitimate constitutional challenge, the federal government cannot meet the requisite standard for its purported *facial* challenge to the Bill. Second, the federal

government cannot show any injury, let alone irreparable harm, because it has not plausibly alleged that federal agents are likely to face liability under the Bill—particularly given the Bill's exceptions for tactical teams, undercover operations, and other exigent circumstances.

Third, and finally, the public interest and balance of the equities lean strongly against issuing injunctive relief. The Bill was enacted in response to the confusion and fear generated by the federal government's deployment of large numbers of federal agents who subsequently applied aggressive enforcement tactics behind the mask of anonymity, undermining public safety and trust. The City thus has a significant interest in protecting its residents and law enforcement officers by restricting the use of face masks and requiring identifying information under the specific circumstances outlined in the Bill. The federal government's generalized assertion that law enforcement operations will be compromised fails to explain how anonymity is essential to performing law enforcement duties other than in those scenarios already contemplated by the Bill's exceptions.

For any or all of these reasons, the federal government cannot establish its entitlement to preliminary injunctive relief, and this Court should deny the federal government's motion.

## II.      BACKGROUND

### A.      The Bill Protects Communities and Law Enforcement

The Bill was enacted against the backdrop of the federal government's deployment of masked, armed agents for immigration enforcement. Unsurprisingly, these actions erode the community's overall sense of public safety and increase the uncertainty as to whether these masked individuals are, indeed, legitimate law enforcement officers. Further, masked operations present heightened dangers for law enforcement officers. For example, when non-uniformed, masked federal agents conduct immigration operations without badges, there is an increased likelihood that their actions will be viewed as criminal activity. *See* NBC News, *Fake ICE agents terrorize*

*immigrants amid Trump's crackdown* (May 25, 2026), https://www.nbcnews.com/news/us-news/ice-impersonators-immigrants-raids-violence-trump-administration-rcna265653. That poses serious threats to law enforcement officers: Anonymity increases confusion, which decreases any sense of legitimacy and endangers the safety of local law enforcement and federal agents alike by escalating the potential for conflict and violence. The presence of unidentifiable federal officers has also made policing more dangerous by spurring the rise of impersonators and vigilantes who pose as federal agents to commit crime. Even the Federal Bureau of Investigation ("FBI") recognizes this risk, warning in its October 2025 bulletin to law enforcement agencies that criminals are posing as immigration agents and targeting victims. *See* NBC News, *Fake ICE agents terrorize immigrants amid Trump's crackdown* (May 25, 2026), https://www.nbcnews.com/news/us-news/ice-impersonators-immigrants-raids-violence-trump-administration-rcna265653.

The Bill amends Chapter 10-800 of Title 10 of The Philadelphia Code, which broadly governs public safety. Its aim is to enhance public trust and transparency between local, state, and federal law enforcement and the community those bodies police, as is necessary to enhance safety. *See* Ex. A, § 1. Pertinent to this lawsuit are four specific provisions, Sections 10-843 through 10-846; from the text of the Bill, each of these provisions plainly applies to local, state, and federal law enforcement officers alike.

Section 10-843 prohibits concealment by law enforcement officers of their identities, including by "[w]ear[ing] a mask, facial covering, disguise or any other garment that obscures the identity of the law enforcement officer." *Id.* § 10-843(2)(a). It also prohibits a law enforcement officer from obscuring badges of identification; using a vehicle that lacks clear identifying information for the entity that employs the officers; and failing to identify oneself to a subject upon

3

request. *Id.* § 10-843(2)(b)-(d). Section 10-843 contains several exceptions, including for an officer who "[w]ears a medical-grade mask or respirator necessary to prevent the transmission of airborne illnesses; "[w]ears a mask for a religious purpose"; "[w]ears protective equipment designed to safeguard the face or head issued as part of duties associated with a Special Weapons and Tactics team"; or "[w]ears an item as a mask designed to protect against smoke or hazardous conditions during fire response or similar emergencies." *Id.* § 10-843(3).

Section 10-844 creates a visible badge requirement under which a law enforcement officer must "[v]isibly display a badge, tag or label clearly identifying the name, rank, and entity that employs the law enforcement officer at all times"; identify themselves to a subject; produce a badge, tag, or label upon request; and use a vehicle that clearly identifies information for the entity that employs the officer. *Id.* § 10-844(2).

Section 10-845 is the civil analogue to Section 10-843. It contains substantially similar prohibitions, and the same exceptions to those prohibitions. *Id.* § 10-845(2)-(3). Section 10-846 is the civil analogue to Section 10-844's visible badge requirement and contains substantially similar prohibitions. *Id.* § 10-846(2). Both Sections 10-845 and 10-846 have private rights of action and civil remedies. *Id.* §§ 10-845(4)-(5), 10-846(4)-(5).

The Bill exempts law enforcement officers from liability under all of these provisions where they are employed by an agency that maintains a written policy under Section 10-848 that prohibits officers from concealing their identities and requires them to visibly display their badges. *Id.* §§ 10-843(3)(b), 10-844(3), 10-845(3)(b), 10-846(3). A compliant policy under Section 10-848 requires law enforcement officers to refrain from using facial coverings when performing their duties, but includes a number of important exceptions: (1) active undercover operations or assignments authorized by supervisors or a court; (2) operations where personal protective gear is

required for physical safety; (3) protection of identity during prosecution; (4) exigent circumstances; (5) when there is a specific, articulable, and particularized reason to believe identification would pose a danger to the physical safety of the officer; and (6) where permitted by applicable law governing occupational health and safety or reasonable accommodations. *Id.* § 10-848(2)(b).

### B.     DOJ Filed this Lawsuit Before the Bill Took Effect and Before It Was Clear How the City Would Enforce the Bill

The federal government filed this pre-enforcement action on June 18, 2026, asserting four counts of violation of the Supremacy Clause for each of Sections 10-843 through 10-846. Compl. ¶¶ 81-111, ECF. No. 1. It acknowledges that the Bill—by its express terms—does not take effect until July 7, 2026. *See* Ex. A, § 3 ("This Ordinance Shall take effect 60 days after its adoption."). The federal government does not allege that any federal officer has been threatened with enforcement of any provision in the Bill by the District Attorney, the City Solicitor, or a private citizen, and it does not allege that any federal agency or law enforcement officer has changed its policies in light of the Bill. It nonetheless seeks the extraordinary remedy of a preliminary injunction. *See* Mem. in Supp. of Pl.'s Mem. for Prelim. Injun., ECF No. 3-1 ("Mot.").

### III.    LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Instead, a preliminary injunction "may only be awarded upon a clear showing that the [movant] is entitled to such relief." *Id.* at 22. The movant must establish that (1) "[it] is likely to succeed on the merits" of its claims; (2) "[it] is likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [its] favor"; and (4) "an injunction is in the public interest." *Id.* at 20.

The first two factors are the "most critical" and require the movant to "demonstrate that it

can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). The Third Circuit has explained that demonstrating irreparable harm is a "heavy burden." *Checker Cab of Phila. Inc. v. Uber Techs., Inc.*, 643 F. App'x 229, 232 (3d Cir. 2016). "In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the *only* way of protecting the plaintiff from harm." *Id.* (quotations omitted). Further, the "requisite feared injury or harm must be irreparable—not merely serious or substantial, and it must be of a peculiar nature, so that compensation in money cannot atone for it." *Id.* (quotations omitted).

"If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* The third and fourth factors, harm to the opposing party and the public interest, merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). "The failure to establish any element renders a preliminary injunction inappropriate." *Ferring Pharms, Inc. v. Watson Pharms., Inc*., 765 F.3d 205, 210 (3d Cir. 2014) (cleaned up). It is the movant's burden to "establish entitlement to relief by clear evidence." *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 526 (3d Cir. 2018) (citing *Winter*, 555 U.S. at 22). *See also Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 202 (3d Cir. 2024) ("Because 'a preliminary injunction is an extraordinary and drastic remedy,' the movant bears the burden of making 'a clear showing.'" (citation omitted)).

IV.    **THE FEDERAL GOVERNMENT IS NOT LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS**

A.    **This Courts Lacks Jurisdiction Because the Federal Government Lacks Article III Standing to Sue in the Pre-enforcement Context**

Article III of the Constitution limits the authority of federal courts to decide "Cases" and "Controversies." *Nat'l Shooting Sports Found. v. Att'y Gen. of New Jersey*, 80 F.4th 215, 218 (3d Cir. 2023). The "case-or-controversy requirement includes ripeness and standing requirements." *Joint Stock Soc'y v. UDV N. Am., Inc.*, 266 F.3d 164, 174 (3d Cir. 2001).

Generally, "ripeness is concerned with *when* an action may be brought, [and] standing focuses on *who* may bring a ripe action." *Id.* (cleaned up). A claim is not ripe where it is "dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all." *Trump v. New York*, 592 U.S. 125, 131 (2020) (quotations omitted). To have standing, a plaintiff must "show an injury in fact caused by the defendant and redressable by a court order." *Nat'l Shooting Sports*, 80 F.4th at 218 (quoting *United States v. Texas*, 599 U.S. 670, 676 (2023)). "An injury in fact, in turn, must be concrete, particularized, and imminent rather than conjectural or hypothetical." *Id.* (quotations omitted). To be imminent, "either a threat of injury must be 'certainly impending,' or there must at least be 'a substantial risk that the harm will occur.'" *Id.* (quoting S*usan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)). The Third Circuit has recognized that ripeness and standing are "closely related" and often "boil down to the same question." *Id.* at 219. *See also Joint Stock Soc'y*, 266 F.3d at 175 (noting that in "measuring whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, the ripeness inquiry merges almost completely with standing"). Ultimately, "[s]tanding and ripeness demand certainty and immediacy." *Nat'l Shooting Sports*, 80 F.4th at 219.

Standing in the context of pre-enforcement actions—as here—is subject to a "specialized test." *Nat'l Shooting Sports*, 80 F.4th at 219. The Supreme Court has permitted pre-enforcement

7

review only "under circumstances that render the threatened enforcement sufficiently imminent." *Driehaus*, 573 U.S. at 159. Pre-enforcement judicial review reflects "the exception rather than the rule" because there is "no unqualified right to pre-enforcement review." *Nat'l Shooting Sports*, 80 F.4th at 219 (quotations omitted). Specifically, in the pre-enforcement context, to have Article III standing, a plaintiff must show that (1) it intends to take action that is (2) "arguably affected with a constitutional interest" but is (3) arguably forbidden by the law, and (4) the threat of enforcement against it is substantial. *Id.* (quoting *Driehaus*, 573 U.S. at 159). To obtain a preliminary injunction in this context, "bare allegations are not enough; the [movant] must produce evidence showing 'more than a mere possibility' that [its] rights are threatened." *Id.* (citation omitted).

Here, whether treated as a standing or ripeness problem, the federal government cannot satisfy Article III's case-or-controversy requirement as it applies to pre-enforcement actions for several reasons. The federal government advances two theories of injury, both of which are "too general" to form the basis for standing. *See Nat'l Shooting Sports*, 80 F.4th at 219.

*First*, the federal government contends that the Bill "inflicts a 'sovereign injury' on the United States." Mot. at 11. But it refrains from asserting that a federal agent intends to take action that is "arguably affected with a constitutional interest" and "arguably prohibited by the law." *See Nat'l Shooting Sports*, 80 F.4th at 219. Instead, the federal government merely claims, in a generalized manner, that it "has sovereign authority to manage federal law enforcement activities" and "need not cede that authority to Philadelphia by complying with Philadelphia's purported requirements for federal law enforcement officers." Mot. at 10-11.

Conspicuously missing is any attempt to specify what conduct federal agents intend to take that is arguably affected with a constitutional interest and prohibited by the Bill. Claiming that federal agents intend to act "in accordance with its own policies and with federal law," Mot. at 10,

8

and the United States "intends to engage in conduct proscribed by the City's ordinance," Compl. ¶ 64, is far too generalized to establish pre-enforcement standing.[1] *See Nat'l Shooting Sports*, 80 F.4th at 220 (rejecting plaintiff's theory of injury because it "rests on 'generalized allegations'" and plaintiff "says little about what it plans to do").

*Second*, the federal government contends that it is injured because its officers are "threatened with" criminal prosecution and civil penalties. Mot. at 11. But in support of that assertion, it merely says that compliance with the Bill "*may* conflict with and differ materially from applicable federal standards and policies." *Id.* (emphasis added). The content of those "federal standards and policies" are not specified. Indeed, the federal government's articulation tacitly implies that there *may* not be any conflict. Such a bare allegation of future harm is exactly the sort over which courts refuse to exercise their Article III jurisdiction. What actions do federal agents intend to take? What law or policy authorizes them? How does such a law or policy conflict with a provision in the Bill? The federal government offers no answers to these key questions, a paucity of information that undermines its standing to bring a pre-enforcement challenge to the Bill.

---

[1] The Complaint cites certain regulations governing the use of unmarked vehicles, Compl. ¶ 72, but the federal government does not argue in the Motion that those regulations conflict with the Bill, *see Surman v. UPMC Presbyterian Shadyside*, No. CV 17-184, 2018 WL 4901107, at *5 (W.D. Pa. Oct. 9, 2018) ("Legal arguments not raised and relief that is not specifically sought in the initial motion are generally deemed waived."). That is likely because the federal government acknowledges that undercover operations, surveillance, and similar law enforcement activities fall within the Bill's exemptions. In any event, the federal government must do more than speculate about *potential* tension between federal and local laws in the abstract to establish standing. Similarly, the federal government implies that the Bill might hamper officers' "flexibility to determine when to announce their identifies," Compl. ¶ 74, but the statute it cites in support does not actually address whether an agent may wear a face mask or conceal a badge of identification. *See infra* n.7. And the federal government concedes that any use of a facial covering would depend "on the facts and circumstances in a particular case," Compl. ¶ 74, demonstrating that any purported injury is purely hypothetical at this stage.

Even if the federal government could show that its officers intend to take action that is arguably affected with a constitutional interest and forbidden by the Bill, it nonetheless cannot demonstrate that any threat of future enforcement is *substantial*. As a preliminary matter, the Bill does not go into effect until July 7. Indeed, the federal government's argument that the Bill will lead to the arrest of federal law enforcement officers is premised on a misrepresentation. In asserting that the City has "proclaimed its intent to enforce *its provisions against federal agents*," Mot. at 11-12, the federal government alleges that the Philadelphia District Attorney has said that he will arrest federal agents for breaking the law. But the federal government omits that the District Attorney's comments, which preceded the Bill's enactment, were not made in relation to the Bill or the Bill's enforcement.[2] In fact, the comments cited by the federal government show that the District Attorney was focused on "federal law enforcement officers who violate **state laws**." Compl. ¶ 61 (emphasis added). The federal government thus "offers no concrete examples" of statements made by the City to enforce *the Bill* against any particular federal or state agents.[3] *See Nat'l Shooting Sports*, 80 F.4th at 220-21 ("[W]e consider what the enforcer has said about enforcement plans.").

Nor are any other traditional signs of a threat of enforcement present here. Though not dispositive, the federal government cannot point to any "past enforcement," as the Bill has not

---

[2]    In particular, the federal government cites two articles. Mot. at 12 nn. 6-7. One article, dated January 14, 2026, related to raids conducted by Immigration and Customs Enforcement agents after the fatal shooting of Renee Good in Minneapolis and the fear it engendered in the community. Mot. 12 n.6. The other article, dated January 29, 2026, related to a coalition of district attorneys from numerous cities created in an effort to ensure accountability "in states around the country where federal agents are being surged." Mot. at 12 n.7. Neither article discusses the Bill.

[3]    The federal government also cites to a two-page letter by the City Solicitor expressing concerns about the Bill. Mot. at 8-9. But nothing in that letter implicates standing or ripeness, and the federal government does not argue it is relevant.

gone into effect. *See Nat'l Shooting Sports*, 80 F.4th at 220 ("A strong sign of future enforcement is that a law has been enforced against the plaintiff, a closely related party, or others for similar conduct."). Nor does the federal government point to any other instances of the City's enforcement of any other law against federal agents. So the federal government cannot credibly claim that enforcement actions are "not a rare occurrence." *Id.* ("It is also telling if enforcement actions are not a rare occurrence." (quotations omitted)). The threat of civil litigation is speculative at this stage, as any private plaintiff would need to experience a cognizable injury to sue under the Bill, at which point the federal government would have the opportunity to raise the very challenges it raises prematurely in this case *with concrete allegations*.

In sum, the federal government does not explain how its agents' conduct will trigger the provisions of the Bill, and its claims are premised on vague contingences that may not come to pass. *See Nat'l Shooting Sports*, 80 F.4th at 221 ("With so much still vague and uncertain, a court should not weigh in."). Its generalized allegations of future harm—including those contained in the declarations submitted by certain officers—fall woefully short of meeting Article III's case-or-controversy requirement to permit pre-enforcement review. This Court should therefore deny the motion and dismiss the action for lack of jurisdiction.

**B.      The Bill Does Not Trigger the Intergovernmental Immunity Doctrine**

As to the substance of its Supremacy Clause claims, the federal government argues that it is likely to succeed on the merits of its claims because the Bill violates the intergovernmental immunity doctrine. Mot. at 15. The Bill does not implicate the intergovernmental immunity doctrine because it does not discriminate against the federal government nor regulate the federal government directly.

The intergovernmental immunity doctrine emanates from the well-established principle that "federal law is supreme" and thus "there is a plain repugnance in letting states interfere with

11

or control the operations of the Federal Government." *CoreCivic, Inc. v. Gov. of N.J.*, 145 F.4th 315, 321, 323 (3d Cir. 2025) (cleaned up). The law in the Third Circuit is clear. "To enforce . . . intergovernmental immunity, modern courts apply a two pronged test: States cannot [1] regulate the United States government directly or [2] discriminate against it or its contractors." *Id.* at 321 (cleaned up).

Here, the federal government clearly cannot satisfy the second prong. The federal government does not allege that the Bill discriminates against it. By its plain language, the Bill applies to local, state, and federal law enforcement officers alike. *See, e.g.*, Ex. A, § 10-843(1)(a) (defining law enforcement officer to include "local, state or federal officers").

Nor can the federal government satisfy the first prong. Under the direct-regulation prong, "nondiscriminatory state laws are [not] unconstitutional just because they may remotely affect federal functions." *CoreCivic, Inc.*, 145 F.4th at 323. In other words, the Supremacy Clause does not "bar all state regulation which may touch the activities of the Federal Government." *Id.* at 324. Instead, it "draw[s] a line at those [regulations] that place a prohibition on the Federal Government," that is, the regulation directly regulates the federal government. *Id.* at 324-25; *see also id.* at 326 (state statute violated intergovernmental immunity doctrine because it "destroyed the federal government's marketplace").

The Third Circuit has reminded parties that "[i]ntergovernmental immunity is not a formalistic doctrine," and "[i]n gauging intergovernmental immunity, the court has long instructed us to 'look through form and behind labels to substance.'" *Id.* at 322 (quoting *City of Detroit v. Murray Corp. of Am.*, 355 U.S. 489, 492 (1958)). The Constitution does not "bar[] all state regulations which may touch the activities of the Federal Government." *Hancock v. Train*, 426 U.S. 167, 179 (1976). Indeed, "an employee of the United States does not secure a general

12

immunity from state law while acting in the course of his employment." *Johnson v. Maryland*, 254 U.S. 51, 56 (1920).

The Bill does not interfere with the duties or goals of the federal government. It does not prevent federal law enforcement officers from doing their jobs. It does not limit where federal law enforcement officers can do their jobs. Nor does it conflict with an existing policy that governs federal law enforcement officers.

Moreover, the exceptions set forth in the Bill make any impact on a federal function remote, at best. The Bill exempts any law enforcement officer that wears a medical-grade mask or respirator to prevent airborne illness, wears a mask for religious purposes, wears protective equipment to safeguard their head or face as part of SWAT duties, or wears a mask to protect against hazardous conditions in a fire or similar emergency. Ex. A, § 10-843(3). In addition, law enforcement officers employed by an agency that maintains a written policy as set forth in Section 10-848 are exempt from *all* liability—and any compliant policy must have a number of exceptions, including for undercover operations, operations that require personal protective gear for safety, and any specific, articulable, and particularized belief of a threat to officer safety. *Id.* § 10-848(2)(b). Taken together, these exceptions mean that the Bill will rarely, if ever, "touch" the activities of federal law enforcement officers.

The federal government's attempt to liken the requirements in the Bill to other cases in which courts in this Circuit and the Supreme Court have found that a statute is barred by intergovernmental immunity are easily distinguishable.[4] The federal government's reliance on

---

[4] In those cases, the challenged statute imposed a wholesale bar on a function and/or project pursued by the federal government. That is not the case here. For example, in *Arizona v. California*, *see Mot.* at 14, the Supreme Court held that the Secretary of the Interior was not required to secure the approval of the State Engineer prior to constructing a dam because, "[i]f Congress has power to authorize the construction of the dam and reservoir, [the Secretary of

13

*CoreCivic, Inc.* fares no better. In that case, the state of New Jersey passed a statute that banned the state, local governments, and private parties from building new facilities to detain people for civil immigration violations, or renewing or extending any existing contracts for the same. 145 F.4th at 320. The plaintiff, CoreCivic, Inc., operated an immigration detention facility pursuant to a contract with the federal government that "fell prey to that ban." *Id.* In finding the statute unconstitutional, the Third Circuit explained that, "[j]ust as the federal government cannot control a state, so too a state cannot control the federal government. Each is sovereign." *Id.* at 319. But when their authorities overlap, "some state rules may legitimately burden the federal government," which "is a normal incident in a system of dual sovereigns." *Id.* (cleaned up). A state goes too far, however, when it "interfer[es] directly with federal policy or 'destroy[s]' it through 'hostile legislation.'" *Id.* (citing *McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316, 400-01 (1819)).

Such "hostile legislation" was the key issue in *CoreCivic*. The Third Circuit ruled that "[o]nly the federal government has the power to decide whether, how, and why to hold aliens for violating immigration law." *Id.* at 325. As such, "[t]he [New Jersey] law interferes with the federal

---

the Interior] is under no obligation to submit the plans and specifications to the State Engineer for approval." *Arizona*, 283 U.S. 423, 451-52 (1931). To require otherwise would give a state bureaucrat the ability to block the construction of a project that was a valid exercise of Congressional power.

Similarly, in *Hancock v. Train*, *see* Mot. at 15, the Supreme Court held that federally owned and operated facilities—including for the United States Army, the Tennessee Valley Authority, and the Atomic Energy Commission—did not have to apply for and receive permits required by Kentucky's Clean Air Act implementation plan. *Hancock*, 426 U.S. 167, 172-74 (1976). In *Hancock*, the Supreme Court noted, "[i]t is clear from the record that prohibiting operation of the air contaminant sources for which the State seeks to require permits is tantamount to prohibiting operation of the federal installations on which they are located." *Id.* at 180 (citations omitted). And in *United States v. Windsor*, *see* Mot. at 14, the Second Circuit enjoined Connecticut from enforcing the permit provisions of the state's Basic Building Code against a federally owned atomic power facility (operated by General Electric), because the federal government's interest in protecting classified information outweighed the town's interest in approving plans. *Windsor*, 765 F.2d 16, 17, 19 (2d Cir. 1985).

14

government's core power to enforce immigration laws." *Id.* at 319. Had the Court held otherwise, the New Jersey statute "would shutter CoreCivic's 'mission critical' detention center." *Id.* at 327. The fatal flaw in the New Jersey statute, therefore, was its foreclosure of the federal government's ability to operate an immigration detention facility.

The Ninth Circuit's recent opinion in *United States v. California*, 173 F.4th 1060 (9th Cir. 2026), which the federal government repeatedly cites and heavily relies upon, does not affect the outcome here.

*First*, the Ninth Circuit's reasoning is flawed. In *California*, the Ninth Circuit considered Section 10 of the No Vigilantes Act, which "mandates the visible display of identification by law enforcement officers operating within the state." 173 F.4th at 1064 (citing Cal. Penal Code § 13654). In ruling that Section 10 violates intergovernmental immunity, the Ninth Circuit relied on *Johnson v. Maryland*, 254 U.S. 51 (1920), and *United States v. City of Arcata*, 629 F.3d 986 (9th Cir. 2010). *Id.* at 1067. Both of these cases involve regulations by a state that would prevent a federal employee from exercising their employment duties.

In *Johnson*, the Supreme Court considered whether the state of Maryland could fine a United States postal worker who drove a government "motor truck" carrying mail through the state without a Maryland license. 254 U.S. at 55. The issue in *Johnson*, therefore, was Maryland's effort to exert control over a federal employee in a manner that required him to "desist from performance" of his duties. *Id.* at 57. The Supreme Court explained that "the immunity of the instruments of the United States from state control in the performance of their duties extends to a requirement that they desist from performance until they satisfy a state officer upon examination that they are competent for a necessary part of them and pay a fee for permission to go on." *Id.* at 57. "Such a requirement does not merely touch the government servants remotely by a general rule

15

of conduct; it lays hold of them in their specific attempt to obey orders and requires qualifications in addition to those that they Government has pronounced sufficient." *Id.*

The state regulation at issue in *City of Arcata* was even more forceful in compelling federal employees to cease working. In that case, Arcata and Eureka, California, passed ordinances intended to "bar the federal government from recruiting, initiating contact with for the purpose of recruiting, or promoting the future enlistment of any person under the age of eighteen into any branch of the United States Armed Forces." 629 F.3d 986 at 988 (cleaned up). The district court granted the federal government's motion for judgment on the pleadings and permanently enjoined the cities from enforcing the ordinances. *Id.* at 988-89. The Ninth Circuit affirmed, noting that "the ordinances—by their express terms—prohibit military recruiters from recruiting or attempting to recruit individuals under the age of eighteen."[5] *Id.* at 991.

The Bill does not require law enforcement officers to stop working. In both *Johnson* and *City of Arcata*, the challenged regulations required the federal government to cease specific acts— driving in the state of Maryland and recruiting future military members, respectively. Indeed, the same is true for *Mayo v. United States*, 319 U.S. 441 (1943), also cited by the Ninth Circuit in *California*, *see* 173 F.4th at 1066-67, in which Florida sought to enforce a law regulating commercial fertilizer against the federal government. The Supreme Court held that Florida could not impose "inspection fees . . . directly upon the United States" because the payments "would be required before executing a function of government [and] [s]uch a requirement is prohibited by the supremacy clause." *Mayo*, 319 U.S. at 447. In these cases, the challenged requirements were

---

[5]   The district court and the Ninth Circuit also held that the statute discriminates against the federal government, *City of Arcata*, 629 F.3d at 991, which the federal government does not argue in this case.

not remote, did not include any exceptions, and required the federal employee to fully cease their government work.

Yet, drawing on these cases, the Ninth Circuit concluded (notably, without a specific case cite) that, "if a state law directly regulates the conduct of the United States, it is void irrespective of whether the regulated activities are essential to federal functions or operations, and irrespective of the degree to which the state law interferes with federal functions or operations." *California*, 173 F.4th at 1067. The aforementioned cases do not support the Ninth Circuit's exceedingly broad proposition. Nor do they support the federal government's argument here because the Bill does not bar law enforcement officers from performing their employment responsibilities.

*Second*, this Court is not bound by the opinions of other circuit courts. *See United States v. Maury*, 695 F.3d 227, 259 n.27 (3d Cir. 2012) ("[T]he decisions of other circuits, while persuasive, are not binding on the district courts in this Circuit."). *Third*, the Ninth Circuit has not made a final ruling on the request for preliminary injunction in that matter, but ruled only on a motion for injunction pending appeal. *California*, 173 F.4th at 1063. Oral argument on the underlying appeal is set for August 2026. *United States v. California,* No. 26-926, Dkt. No. 38 (9th Cir. June 14, 2026). This Court should decline to follow *California*.

The level of interference that other courts found violative of intergovernmental immunity, and therefore unconstitutional, is not present here. The Bill does not preclude the federal government from engaging in law enforcement activities. Rather, the Bill simply embraces customs that have been present in this country for decades. The challenged provisions are designed to engender trust in law enforcement by Philadelphia residents and further public safety. *See* Ex. A, § 1(2) ("Transparency in governmental actions, including for officers of the peace, is essential to create the trust between community members and agents of state, local, and federal government

17

that is needed for public safety."). To facilitate this trust, the Bill sets forth minimal identification requirements, with multiple exceptions that allow for less transparency when needed. Those exceptions are triggered as soon as an agency adopts a policy as set forth in Section 10-848, and include exigent circumstances, a perceived threat to personal safety, and undercover operations. And the cases that the federal government relies upon show a degree of interference markedly different from what the federal government alleges here—in those cases, allowing the challenged statute would have brought the federal government's activities to a standstill. The Bill does not violate the Supremacy Clause, and the intergovernmental immunity doctrine is inapplicable.[6]

### C.      The Federal Government Cannot Satisfy the Standard for Bringing a Facial Challenge to the Bill Based on Hypothetical Circumstances

Even if there were some hypothetical circumstances where individual federal agents would be immune from state prosecution based on intergovernmental immunity, the federal government asserts a facial constitutional challenge because it seeks an injunction prohibiting the City from enforcing the Bill against *any federal agent* "beyond the particular circumstances" before the Court. *Doe v. Reed*, 561 U.S. 186, 194 (2010); *see also Benezet Consulting LLC v. Sec'y Commonwealth of Pennsylvania*, 26 F.4th 580, 585 (3d Cir. 2022) ("as-applied relief must be limited to the specific plaintiffs and circumstances of the litigation."). It cannot meet that demanding standard for a facial challenge.

To prevail on a facial challenge, a plaintiff must show that "no set of circumstances exists under which the [Bill] would be valid." *United States v. Cuevas-Almonte*, 156 F.4th 319, 328 (3d

---

[6] Should this Court disagree with the City as to some, but not all, sections of the Bill, each relevant section contains a severability provision. *See* Ex. A, §§ 10-483(6), 10-844(6), 10-845(6), 10-846(6), 10-847(5); *see also Planned Parenthood League v. Bellotti*, 641 F.2d 1006, 1023 (1st Cir. 1981) (preliminarily enjoining only certain sections of a statute because they were severable from the other provisions).

Cir. 2025). Significantly, the "Supreme Court has repeatedly emphasized that facial challenges are disfavored—particularly where . . . they rest on undeveloped factual records or require speculation on hypothetical applications." *Id.* That is the case here. For many federal, state, and local law enforcement officers, the Bill would be irrelevant. And the plain language of the Bill provides a number of circumstances where a federal agent could wear a mask without facing liability. For example, a federal agent who wears a mask in connection with his or her duties on a special weapons or tactical team could continue doing so in compliance with the Bill. *See* Ex. A, § 10-843(3). Similarly, a federal agent who wears a facial covering to protect against hazardous conditions during fire response or similar emergencies would be in compliance with the Bill. *Id.* And the federal government could easily adopt a policy that allows mask wearing or plain clothes in undercover operations. *Id.* § 10-848(2)(b). In short, it is not difficult to conceive of circumstances where the Bill has constitutional applications. That is fatal to the federal government's facial challenge.

## V.     THE FEDERAL GOVERNMENT WILL NOT SUFFER IRREPARABLE HARM

Fundamentally, the federal government's argument that it will suffer irreparable harm is based solely on the alleged existence of a Supremacy Clause violation. Mot. at 21-22. This argument fails because, as explained above, it cannot demonstrate a likelihood of success on the merits. *See Garrett v. PennyMac Loan Servs.*, No. 3:18-CV-00718, 2018 WL 2981266, at *3 (M.D. Pa. June 14, 2018) (finding "no ongoing [due process] violation, and thus no irreparable harm"); *Patel v. Glenn*, No. 21-3499, 2022 WL 16647974, at *8 (6th Cir. Nov. 3, 2022) ("[W]e have already concluded that the constitutional claims are without merit, meaning that they have made no showing of irreparable harm from constitutional injury."); *Roe v. Fauver*, No. CIV. 88-1225 (AET), 1988 WL 47359, at *4 (D.N.J. May 13, 1988) ("Without a showing of a violation of her constitutional rights, plaintiff has not shown irreparable harm.").

19

The federal government asserts "several additional irreparable harms," but they fare no better. Mot. at 22. For example, the federal government claims that the Bill's challenged provisions, if not enjoined, will endanger federal officers by publicly exposing their identities, citing several declarations of federal officers for support. *See id.* But it provides no explanation to support the claim that individual officers will likely face an increased risk of harassment or harm if they comply with the Bill, including its various exemptions. Given that thousands of officers routinely perform their law enforcement responsibilities without their faces covered, there is good reason to doubt this assertion. More to the point, "a risk of irreparable harm is not enough" for the federal government to meet its burden. *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987). Rather, the federal government must make a clear showing of *immediate irreparable harm* to establish its entitlement to injunctive relief. *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) ("A plaintiff has the burden of proving a "clear showing of immediate irreparable injury."); *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 488 (3d Cir. 2000) ("we have also insisted that the risk of irreparable harm must not be speculative."). The declarations filed with the Motion provide only generalized descriptions of *potential* threats that federal agents "could" face in performing their jobs, including concerns about being doxed online. *See* ECF No. 3-3, ¶¶ 8, 9; ECF No. 3-4 ¶¶ 16, 17; ECF No. 3-5, ¶¶ 20, 24, 25; ECF No. 3-6, ¶ 14. These declarations are far too speculative to establish an immediate, irreparable harm.

The federal government also claims it will suffer irreparable injury because the Bill "impedes" and "prevents" officers from engaging in federal enforcement operations, including surveillance or undercover operations. Mot. at 23-24. But it ignores that the Bill applies while a law enforcement officer "perform[s] official duties *and* interact[s] with the public." Ex. A., § 10-843(2). The conjunctive language means that many surveillance and undercover operations would

20

be exempt. Law enforcement officers conducting surveillance, providing protection, or even engaging in undercover operations are not "interacting with the public," as contemplated by the Bill. Mot. at 22-23. Rather, these activities are plainly exempted from the Bill's scope. The federal government's interpretation of the Bill omits this qualifying language. The Bill also exempts officers involved in any SWAT and other tactical operations. Ex. A, § 10-843(3) (allowing face covering in the performance of "duties associated with a Special Weapons and Tactics team"). And surveillance and undercover operations are exempted by any policy that meets the requirements of Section 10-848. The assertion that the Bill would limit federal agencies from "deploy[ing] unmarked vehicles as a critical and congressionally sanctioned tool for conducting undercover operations, surveillance, and other sensitive law enforcement activities," Mot. at 23, is not well founded.

A "violent gang investigation where federal agents conduct surveillance to observe a drug transaction" would likewise fall within the Bill's exceptions. Mot. at 26. Several declarants similarly claim that the Bill interferes with their duties when in fact it does not.[7] *See, e.g.*, ECF No. 3-3, ¶ 12 ("[A]n FBI Special Agent may conduct surveillance operations to obtain investigative intelligence relevant to an investigation."). Indeed, one declarant worries that disclosure of "non-public details about who, when, how, and under what circumstances the FBI conducts surveillance" might undermine such operations, *see id.*, even though the Bill does not require such a detailed disclosure. For all these reasons, the federal government has not

---

[7]    In support of its argument that federal regulations grant officers discretion to wear facial coverings and remove identifiers, the federal government cites 8 C.F.R. § 287.8(c)(2)(iii). But that regulation provides that "an immigration officer who is authorized to execute an arrest" shall announce themselves and the purpose of the arrest "as soon as it is practical and safe to do so." *Id.* It says nothing about whether an agent may wear a face mask or conceal his or her badge of identification.

21

demonstrated an immediate irreparable harm, so its motion can be denied on this basis alone. *See Winter*, 555 U.S. at 22 (Plaintiff must show "likelihood" not just "possibility" of irreparable harm for injunctive relief).

## VI.    THE BALANCE OF HARDSHIPS AND PUBLIC INTEREST FAVOR DENYING A PRELIMINARY INJUNCTION

For government parties, the balance of hardships and the public interest *Winter* factors merge. *See Nken*, 556 U.S. at 435 (2009). After weighing "the effect on each party of the granting or withholding of the requested relief," if the balance tips in the City's favor, the preliminary injunction should be denied. *See Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Village of Gambell, Alaska*, 480 U.S. 531, 542 (1987)).

Here, the alleged harm to the federal government is minimal. The federal government argues that the public interest is served by an injunction because the Bill is unconstitutional. Mot. at 26-27. That merely repeats its arguments on the merits and, as discussed *supra*, those arguments fail. Courts have found that "[g]eneral pronouncements that a Supremacy Clause violation alone causes sufficient harm" do not automatically tip the balance of equities in the government's favor. *See, e.g.*, *United States v. California*, 921 F.3d 865, 894 (9th Cir. 2019). The federal government also contends that the Bill frustrates federal statutes, Mot. at 27, but it does not identify a single federal statute or policy with which compliance is not possible because of the Bill.

By contrast, the impact on the City and its residents should the Court grant an injunction would be substantial. The goals of the Bill are noble. Contrary to the federal government's characterization of the Bill as being "aim[ed] . . . to hinder federal agents from participating in crucial law enforcement operations in the city and to chill effective enforcement of the law," Mot. at 28, the Bill aims to allow law enforcement officers to perform their jobs safely and effectively,

22

while simultaneously maintaining public trust and accountability. All of these are essential for public safety.

A preliminary injunction will negatively impact city residents. *See supra* § II.A. Philadelphians are more likely to fear and distrust law enforcement officers who conceal their identities for no reason, further fraying trust that is crucial to any meaningful relationship between the government and the governed. And enforcement actions taken by unidentified federal agents in plainclothes – outside of the common sense exceptions in the Bill – may cause community members to believe they are witnessing and/or victims of a crime, increasing the risk of a violent confrontation and posing additional dangers for local law enforcement.

Enjoining the law would severely undermine the public interest and irreparably harm the City. *See Delaware State Sportsmen's Ass'n, Inc. v. Delaware Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 206 (3d Cir. 2024) (affirming denial of preliminary injunction where "Delaware's legislature passed [the challenged] bills, and Delaware's governor signed them into law"); *Maryland v. King*, 567 U.S. 1301, 1303 (2012) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (cleaned up)).

In sum, the City enacted a Bill that aims to prioritize public safety by protecting law enforcement officers and the public, and the balance of equities thus clearly favors the City.

## VII.    CONCLUSION

For the foregoing reasons, the City respectfully requests that this Court deny the federal government's motion for a preliminary injunction.

DATED: June 25, 2026

**BALLARD SPAHR LLP**

By:    *s/ David L. Axelrod*
        David L. Axelrod, ID 323792
        Facundo Bouzat, ID 335101
        Chesley Burruss, ID 331521
        **BALLARD SPAHR LLP**
        1735 Market Street, 51st Floor
        Philadelphia, PA 19103-7599
        Telephone: 215.665.8500
        Facsimile: 215.864.8999
        axelrodd@ballardspahr.com
        bouzatf@ballardspahr.com
        burrussc@ballardspahr.com

        *Attorneys for Defendants*

24

**CERTIFICATE OF SERVICE**

I certify that on June 25, 2026, a true and correct copy of Defendants' foregoing Opposition to Plaintiff's Motion for Preliminary Injunction was filed electronically via the Court's CM/ECF system and served via CM/ECF on all counsel of record.

*s/ David L. Axelrod*
David L. Axelrod