IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THE UNITED STATES OF AMERICA,   :
  *Plaintiff,*        :
               :
  v.           :  CIVIL NO. 26-4208
               :
CITY OF PHILADELPHIA, et al.,   :
  *Defendants.*       :

**MEMORANDUM**

**KENNEY, J.**                  **JULY 2, 2026**

The "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land[.]"  U.S. Const. art. VI, cl. 2.  Consistent with "the unavoidable consequence of that supremacy which the [C]onstitution has declared," it is well-settled that "the states have no power . . . to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government."  *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819).  When the Philadelphia City Council voted to pass Bill No. 260060 ("Bill 260060" or the "Bill"), it attempted to sidestep the Constitution's clear mandate and disregarded this fundamental principle of law that has informed American jurisprudence for over 200 years.

Bill 260060 purports to require significant changes to how law enforcement at the local, state, and federal level carry out their duties and interact with members of the public.  In broad strokes, the Bill prohibits law enforcement officers from wearing masks or facial coverings, or from intentionally concealing badges and other identifying information, subject to limited exceptions.  *See, e.g.*, § 10-843(2)–(3).[1]  In addition, it requires officers to visibly display badges,

---

[1] The United States attached a copy of Bill 260060 as Exhibit A to the Complaint.  *See* ECF No. 1-2.  For clarity, the Court will refer directly to sections of the Bill throughout this Memorandum.

use vehicles that contain clear identifying information, and, upon request, to identify themselves to individuals who are subject to an arrest. *See* § 10-844(2). If officers fail to comply, the Bill subjects them to serious civil and criminal penalties. *See* § 10-843(4); § 10-844(4); § 10-845(5); § 10-846(5). In heeding City Solicitor Renee Garcia's sound advice not to sign Bill 260060 due to the "inaccurate signal" it would send "to the public that the [Parker] Administration can legally and practically enforce the Bill[,]" Mayor Cherelle Parker acted with civic wisdom and courage to stand up for the Constitution and follow the rule of law to where it led, despite what may have been strong personal inclinations to the contrary. *See* ECF No. 1 ¶ 60 (citation omitted). Nevertheless, Bill 260060 became law on May 8, 2026 in the absence of Mayor Parker's signature, and is set to take effect on July 7, 2026. *Id.* ¶ 28.

Faced with threatened municipal control and prosecution of federal law enforcement officers, on June 18, 2026, the United States filed a Motion for a Preliminary Injunction (the "Motion") to enforce the federal government's authority to direct the operation of its own agencies, officers, and employees. *See* ECF No. 3. For the reasons set forth below, the Court holds that the United States may challenge the constitutionality of Bill 260060 before it takes effect because the United States has satisfied the requirements for pre-enforcement standing. In addition, the United States has demonstrated a likelihood of success on the merits of its claims because, through various provisions of Bill 260060, Defendants attempt to directly regulate federal agents and officers in the performance of their governmental duties, notwithstanding that the Supremacy Clause plainly bars them from doing so. The other factors that courts consider prior to issuing a preliminary injunction weigh strongly in favor of the United States, too. Accordingly, the Court will **GRANT** the United States' Motion (ECF No. 3), and will **PRELIMINARILY ENJOIN** Defendants, the Defendants' officers, agents, servants, employees, and attorneys, and all other persons who are in

active concert or participation with any of the Defendants, from implementing or enforcing Section 2, § 10-843, § 10-844, § 10-845, § 10-846 of Bill 260060 as to federal agencies and officers.

## I.    <u>BACKGROUND</u>

### A.  Philadelphia City Council Passes Bill 260060

On April 23, 2026, the Philadelphia City Council passed Bill 260060, which purports to require considerable changes to how law enforcement officers operate in Philadelphia.  *See* ECF No. 1 ¶ 27 (citing ECF No. 1-2).  As relevant to the United States' Motion, multiple provisions within the Bill define "Law Enforcement Officer" as "[a]ny 'peace officer' as defined in 18 Pa.C.S. § 501 . . . , including but not limited to local, state or *federal* officers."  § 10-843(1)(a) (emphasis added); *see also* § 10-844(1)(a); § 10-845(1)(a); § 10-846(1)(a).[2]

As to the substance of Bill 260060, the Bill generally prohibits law enforcement officers from concealing their identities or badges, and from removing identifying information from vehicles when performing their duties and interacting with the public, subject to certain exceptions. For instance, § 10-843(2)(a) provides that a law enforcement officer can be held liable for "criminal concealment" if the officer "[w]ears a mask, facial covering, disguise or any other garment that obscures the [officer's] identity[.]"  § 10-843(2)(a).  Under that same section, a law enforcement officer may also be subject to criminal liability if the officer "[i]ntentionally obscures, covers, removes or otherwise conceals a badge, tag, label or other identifying information[,]" or if the officer "[u]ses a vehicle in the course of official duties that does not contain clear identifying

---

[2] 18 Pa.C.S. § 501, in turn, defines "[p]eace officer" as "[a]ny person who by virtue of his office or public employment is vested by law with a duty to maintain public order or to make arrests for offenses, whether that duty extends to all offenses or is limited to specific offenses, or any person on active State duty pursuant to 51 Pa.C.S. § 508 (relating to active duty for emergency).  The term 'peace officer' shall also include any member of any park police department of any county of the third class."  18 Pa.C.S. § 501.

information[.]" § 10-843(2)(b)–(c). As another example, § 10-846(2)(a) subjects law enforcement officers to civil liability "for tortious failure to make an identifying badge visible" if the officer, "while performing official duties and interacting with the public, fails to . . . [v]isibly display a badge, tag or label clearly identifying the name, rank, and entity that employs the law enforcement officer at all times." § 10-846(2)(a). Moreover, the Bill mandates that law enforcement agencies develop publicly available policies related to the use of facial coverings. *See* § 10-848. § 10-848(1) requires "[a] law enforcement agency operating in Philadelphia" to "maintain and publicly post a written policy prohibiting officers from concealing their identity, and requiring officers to visibly display their badge and other official identifying information, when performing enforcement duties." § 10-848(1). These written policies must also include specific items to be compliant. *See* § 10-848(2).

To be sure, various provisions within the Bill exempt certain conduct from their purview, *see, e.g.*, § 10-843(3), but those exemptions are limited in nature. § 10-843(3) provides that a law enforcement officer is not liable for violating the prohibition on wearing masks or facial coverings if the officer "[w]ears a medical-grade mask or respirator necessary to prevent the transmission of airborne illnesses[,]" "[w]ears a mask for a religious purpose[,]" "[w]ears protective equipment designed to safeguard the face or head issued as part of duties associated with a Special Weapons and Tactics team[,]" or "[w]ears an item as a mask designed to protect against smoke or hazardous conditions during fire response or similar emergencies." § 10-843(3)(a)(1)–(4). An officer can also avoid criminal liability under § 10-843 if the officer's employer "maintains and publicly posts a written policy pursuant to Section 10-848." § 10-843(3)(b); *see also* § 10-844(3); § 10-845(3); § 10-846(3).

If local, state, or federal law enforcement officers fail to adhere to the Bill's requirements, the Bill expressly provides for the imposition of both civil and criminal penalties. *See* § 10-843(4)–(5); § 10-844(4)–(5); § 10-845(4)–(5); § 10-846(4)–(5). With respect to criminal penalties, the Bill authorizes the Philadelphia District Attorney to commence a criminal enforcement action "against any law enforcement officer" that fails to comply with § 10-843. *See* § 10-843(5); *see also* § 10-844(5). For each incident of noncompliance with § 10-843, violators can be forced to pay a fine, be imprisoned for up to 90 days, or be subject to both a fine and imprisonment. *See* § 10-843(4). In addition to providing for criminal enforcement, the Bill contains a private right of action that allows for the initiation of civil enforcement actions against law enforcement officers by private individuals. *See* § 10-845(4); § 10-846(4). For example, § 10-845(4) allows "[t]he City Solicitor or any individual aggrieved by a violation of [§ 10-845] or any entity a member of which is aggrieved by a violation of [§ 10-845]" to "bring a civil action in a court of competent jurisdiction against a county, city, department or agency that employs a person violating [§ 10-845]." § 10-845(4); *see also* § 10-846(4).

While Mayor Parker was deliberating over whether to sign and formally approve Bill 260060, on May 7, 2026, City Solicitor Garcia sent her Office a letter expressing concerns over the Bill's legality. *See* ECF No. 1 ¶ 60. Garcia stated that "the Bill poses 'significant legal problems, primarily concerning the authority of the City to regulate the conduct of federal officers when carrying out their duties under federal law.'" *Id.* & n.6 (quoting Letter from City Solicitor Renee Garcia to Mayor Cherelle Parker re: Bill No. 260060 ("Prohibition on Law Enforcement Secreting Their Identity") at 1 (May 7, 2026) [hereinafter Garcia Letter], *available at*, David Chang, et al., *Mayor Parker signs all 'ICE Out' bills in Philly except for mask ban*, NBC10 PHILADELPHIA (May 7, 2026), https://www.nbcphiladelphia.com/news/local/mayor-parker-signs-

all-ice-out-bills-in-phillyexcept-for-mask-ban/4398543/).  In addition, Garcia noted that the Ninth Circuit had recently granted a preliminary injunction enjoining California from enforcing "a California law substantially similar to" Bill 260060 against the federal government.  *See* Garcia Letter at 1; *see also* ECF No. 1 ¶ 60.  "Given the Bill's significant legal and operational challenges," Garcia recommended against signing the Bill because doing so "would send an inaccurate signal to the public that the [Parker] Administration can legally or practically enforce the Bill."  Garcia Letter at 2.

On May 7, 2026, Mayor Parker declined to sign Bill 260060, citing City Solicitor Garcia's letter.  *Id.* ¶¶ 28, 60.  Nevertheless, on May 8, 2026, Bill 260060 became law in the absence of Mayor Parker's signature because under the terms of the Philadelphia Home Rule Charter, "[i]f the Mayor does not return [an] ordinance within the time required," the ordinance still "become[s] law without the Mayor's approval."  *Id.* ¶ 28 & n.4 (quoting Phila. Home Rule Charter, art. II, § 2-202).  Section 3 of the Bill provides that it "shall take effect 60 days after its adoption," so its provisions are set to become effective beginning on July 7, 2026.  *See* ECF No. 1-2 at 10 (Section 3); *see also* ECF No. 1 ¶ 28.

### B.  Procedural History

On June 18, 2026, the United States filed a Complaint in the U.S. District Court for the Eastern District of Pennsylvania, asserting four causes of action for violations of the Supremacy Clause.  *See id.* ¶¶ 81–111.  That same day, the United States also filed the instant Motion for a Preliminary Injunction, seeking to preliminarily enjoin Defendants, Defendants' officers, agents, servants, employees, attorneys, and any other individuals who are in active concert or participation with any of the Defendants, from implementing or enforcing Section 2, § 10-843, § 10-844, § 10-845, § 10-846 of Bill 260060 against any federal agencies or officers.  *See* ECF No. 3 at 1.

6

On June 25, 2026, Defendants City of Philadelphia, Mayor Cherelle Parker, District Attorney Lawrence Krasner, and City Solicitor Renee Garcia filed an Opposition to Plaintiff's Motion for a Preliminary Injunction (the "Opposition"). *See* ECF No. 18.[3]

After no party requested an evidentiary hearing—despite the Court's invitation to hold one—the Court indicated its intent to determine the United States' Motion on the parties' submissions. *See* ECF Nos. 4, 15–16.[4] The United States' Motion is fully briefed and before the Court.

## II.    <u>LEGAL STANDARD</u>

Under Federal Rule of Civil Procedure 65, parties can move for the entry of a preliminary injunction. *See* Fed. R. Civ. P. 65. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To obtain a preliminary injunction, the movant must show the following: "(1) [it] will likely succeed on the merits, (2) [it] will likely suffer irreparable injury without an injunction, (3) the balance of equities favors [it], and (4) an injunction serves the public interest." *Schrader*, 74 F.4th at 126 (citing *Winter*, 555 U.S. at 20). The Third Circuit has further explained that the movant must meet the first two "gateway factors"—that is, a movant must first "demonstrate that it can win on the merits"

---

[3] Although the attorneys for Defendants City of Philadelphia, Mayor Parker, and City Solicitor Garcia did not file a notice of appearance on behalf of District Attorney Krasner, counsel nevertheless purported to file Defendants' Opposition on his behalf. *See* ECF No. 18; *see also* ECF Nos. 7–9. Therefore, the Court will construe the Opposition as filed by all Defendants.

[4] Furthermore, the Third Circuit has "'long . . . recognized that a preliminary injunction may issue . . . without a hearing, if the evidence submitted by both sides does not leave unresolved any relevant factual issue.'" *Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 126 (3d Cir. 2023) (quoting *Williams v. Curtiss-Wright Corp.*, 681 F.2d 161, 163 (3d Cir. 1982) (per curiam)); *see also* *Beberman v. U.S. Dep't of State*, 675 F. App'x 131, 135 (3d Cir. 2017) ("'[A]n evidentiary hearing is not always required before resolving a preliminary injunction.'" (quoting *Arrowpoint Cap. Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 324 (3d Cir. 2015))).

and that "it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017), *as amended* (June 26, 2017); *see also Holland v. Rosen*, 895 F.3d 272, 286 (3d Cir. 2018) ("The first two factors are prerequisites for a movant to prevail."). If those two gateway factors have been demonstrated, then a district court "considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly*, 858 F.3d at 179. In addition, because a governmental entity is an opposing party, "[f]actors three and four merge." *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 225 (3d Cir. 2026) (internal quotations and citation omitted); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III.    <u>DISCUSSION</u>

### A.  Standing

Although this case presents a relatively straightforward legal question, the Court conducts a thorough analysis, beginning with the threshold issue of standing. Under Article III of the U.S. Constitution, the jurisdiction of federal courts is limited to "Cases" and "Controversies." U.S. Const. art. III, § 2; *see also Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) ("Federal courts are courts of limited jurisdiction . . . [and] possess only that power authorized by Constitution and statute"). Consistent with this limitation, the doctrine of standing has been developed to assist federal courts in "identify[ing] those disputes which are appropriately resolved through the judicial process." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotations and citation omitted); *see also Nat'l Shooting Sports Found. v. Att'y Gen. of N.J.*, 80 F.4th 215, 218 (3d Cir. 2023) ("Before reaching the merits, [courts] must first ensure that [a] case presents a dispute suitable for courts to resolve."). In order to establish standing, "a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct

complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) [hereinafter *Driehaus*] (quoting *Lujan*, 504 U.S. at 560–61).

Here, the parties primarily dispute whether the United States has satisfied the "injury-in-fact" requirement, so the Court focuses its analysis on the first prong. *See* ECF No. 3-1 at 17–20; ECF No. 18 at 12–16. A plaintiff can demonstrate an "injury-in-fact" by alleging a "concrete and particularized" and "actual or imminent, not conjectural or hypothetical" injury. *Lujan*, 504 U.S. at 560 (internal quotations and citations omitted). Although Bill 260060 does not take effect until July 7, 2026, the United States argues that it has pre-enforcement standing to challenge the constitutionality of the Bill because the United States intends to engage in conduct that the Bill prohibits and "the threat of future enforcement is substantial." ECF No. 3-1 at 17–18.

"When an individual is subject to" threatened enforcement of a law, "an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Driehaus*, 573 U.S. at 158. In other words, though "there is no unqualified right to pre-enforcement review[,]" courts "do not force people seeking to exercise their constitutional rights to wait until they are prosecuted criminally" before filing suit. *Nat'l Shooting Sports Found.*, 80 F.4th at 219 (internal quotations and citations omitted); *see also Steffel v. Thompson*, 415 U.S. 452, 459 (1974) ("[I]t is not necessary that petitioner first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights."). Instead, federal courts allow "pre-enforcement review under circumstances that render the threatened enforcement sufficiently imminent." *Driehaus*, 415 U.S. at 159. To be considered "imminent," the "threat of injury must be 'certainly impending,' or there must at least be 'a substantial risk that the harm will occur.'" *Nat'l Shooting Sports Found.*, 80 F.4th at 218–19

9

(quoting *Driehaus*, 415 U.S. at 158)).  To meet the injury-in-fact requirement in the context of a pre-enforcement action, then, a plaintiff must allege (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest[;]" (2) that the conduct is "proscribed by a statute[;]" and (3) that "there exists a credible threat of prosecution" under the statute.  *Driehaus*, 415 U.S. at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)); *see also Nat'l Shooting Sports Found.*, 80 F.4th at 219 (same).  Furthermore, when seeking a preliminary injunction, "bare allegations are not enough;" the movant "must produce evidence showing more than a mere possibility that their rights are threatened."  *Id.* (internal quotations and citation omitted).

With this framework in mind, the Court turns to the circumstances presented by this case. First, in its Motion, the United States describes two theories of injury in support of pre-enforcement standing, starting with an alleged "sovereign injury."  ECF No. 3-1 at 18.  The United States explains that it maintains "sovereign authority to manage federal law enforcement activities" and that it intends to "act through its officers in accordance with its own policies and with federal law." *Id.* at 17.  As such, it "need not cede that authority to Philadelphia by complying with Philadelphia's purported requirements for federal law enforcement officers."  *Id.* at 18.  In addition, the United States argues that its officers will be "endanger[ed]" and their "operational effectiveness" will be "reduce[d]" if they are subjected to the requirements that the Bill seeks to impose, which "may conflict with and differ materially from applicable federal standards and policies."  *Id.*  Therefore, the United States asserts that it "will not direct" federal law enforcement officers and agencies "to adopt the policies that Philadelphia demands," nor will the United States "require its officers to comply with these provisions of Philadelphia law."  *Id.*

Moreover, the United States submitted declarations in support of its Motion, in which federal officials from various federal agencies indicate that enforcement of the Bill poses a serious risk of harm to their operations and employees. *See* ECF No. 3-3; ECF No. 3-4; ECF No. 3-5; ECF No. 3-6. For example, Wayne Jacobs, the Special Agent in Charge of the Federal Bureau of Investigation's ("FBI") Philadelphia Field Office stated that enforcing the Bill "against the FBI could reasonably be expected to harm or endanger the lives or physical safety" of federal agents and their family members. ECF No. 3-3 ¶ 8. If a Special Agent is required to display "personally identifying information . . . during an investigation or operation[,]" the Agent and his family could be subjected to "unwarranted attention, threats, and harassment." *Id.* ¶ 9. In addition, enforcing the Bill against the FBI "could reasonably be expected to harm national security and the integrity of ongoing and future FBI investigations or operations" if FBI Special Agents are forced to disclose "non-public details about who, when, how, and under what circumstances the FBI conducts surveillance[,]" effectively "rendering the techniques" that the FBI employs "useless." *Id.* ¶¶ 11–12. In order "to mitigate these harms and threats to officer safety and effectiveness[,] . . . it is essential that FBI Special Agents have discretion to wear masks and otherwise protect their identities." *Id.* ¶ 13. Accordingly, Mr. Jacobs states that "FBI Special Agents in the Philadelphia Field Office will disregard the ordinance where they deem it appropriate to do so." *Id.* ¶ 14; *see also* ECF No. 3-4 ¶¶ 13–22; ECF No. 3-5 ¶¶ 16, 18–35; ECF No. 3-6 ¶¶ 9–14, 16–20.

The United States thus presents far more than "generalized allegations" of harm and explains "what it plans to do": once the Bill goes into effect, it intends to instruct federal law enforcement officers to act in accordance with federal procedures and policies, rather than adopt the requirements mandated by the City of Philadelphia, which will impede and harm the operations of federal law enforcement. *Nat'l Shooting Sports Found.*, 80 F.4th at 219–20. Furthermore, at

its core, the United States' intended course of conduct relates to an alleged violation of the Supremacy Clause, so it is necessarily "affected with a constitutional interest." *Driehaus*, 573 U.S. at 162 (internal quotations and citation omitted); *cf. United States v. Texas*, 794 F. Supp. 3d 427, 444 (W.D. Tex. 2025) (finding that because the plaintiff alleged harm that "results from a statute preempted by federal law and thus violative of the Supremacy Clause, the [plaintiff's] injury [was] constitutionally cognizable"). Therefore, the United States has sufficiently established "an intention to engage in a course of conduct arguably affected with a constitutional interest." *Driehaus*, 573 U.S. at 161 (internal quotations and citation omitted); *see also United States v. California*, 819 F. Supp. 3d 1109, 1121 (C.D. Cal. 2026) (finding that the United States demonstrated "the first two *Driehaus* factors" because "its supporting declarants have asserted multiple times that federal law enforcement agencies and officers intend to engage in federal law enforcement activities that are not in compliance with the No Secret Police Act or the No Vigilantes Act").

Second, the United States has established that its law enforcement officers' proposed course of conduct is "proscribed by" the provisions of Bill 260060. *Driehaus*, 573 U.S. at 159. For instance, John Rife, the Acting Field Officer Director for the U.S. Department of Homeland Security, United States Immigration and Customs Enforcement ("ICE"), and Enforcement and Removal Operations Philadelphia Field Office, stated that "ICE policy permits personnel to use any facial covering they feel is appropriate to meet operational needs and to protect them from health hazards." ECF No. 3-5 ¶ 27. However, § 10-843 conflicts with that policy and makes it illegal for federal law enforcement officers to wear facial coverings, except under narrow circumstances. *See* § 10-843(2)–(3). Therefore, the United States contends that it "will not direct its law enforcement officers to adopt the policies" that are required by Bill 260060. ECF No. 3-1

12

at 18. Instead, federal officials from various agencies, such as the Drug Enforcement Administration ("DEA"), "do[] not intend to comply with the requirements of Bill 260060, or to require Special Agents to comply with these provisions." ECF No. 3-4 ¶ 21; *see also* ECF No. 3-3 ¶ 14 ("FBI Special Agents in the Philadelphia Field Office will disregard the ordinance"). And noncompliance is reasonably expected to open federal agents up to "the threat of criminal charges" and civil penalties. ECF No. 3-4 ¶ 21.

Third, the United States has demonstrated that it faces a credible threat of enforcement from Defendants. First and foremost, although the movant "need not 'confess that [it] will in fact violate th[e] law[,]' . . . it must give [the Court] something to go on" in order to demonstrate a credible threat. *Nat'l Shooting Sports Found.*, 80 F.4th at 221 (quoting *Driehaus*, 573 U.S. at 163). As explained above, the United States has stated that it will not adopt the practices required by Bill 260060, and has submitted evidence indicating that its law enforcement officers do not intend to comply with the Bill's requirements. *See* ECF No. 3-3 ¶ 14; ECF No. 3-4 ¶¶ 15, 21. Based on this record, there is more than a mere "something," *Nat'l Shooting Sports Found.*, 80 F.4th at 221; here, there is a palpable threat, and the United States has indicated its definitive intent to stay the course in the face of that threat. *See Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644, 653 (9th Cir. 2021) (finding pre-enforcement standing where plaintiff had a "concrete plan to violate" the statute and continue on with its "current business practices" instead).

In addition to considering whether a party has articulated an intent not to comply with a local ordinance or statute, there are other signs that courts look for when evaluating whether a credible threat of enforcement exists, such as "past enforcement." *Driehaus*, 573 U.S. at 164. Here, Bill 260060 is "new, so lack of enforcement does not tell [the Court] much either way." *Nat'l Shooting Sports Found.*, 80 F.4th at 220. Nevertheless, there are other "enforcer-related

signs" that are present. *Id.* at 221. "For one, the risk of enforcement is greater when private parties can enforce the law." *Id.* While the Bill limits criminal enforcement to the District Attorney's Office, some of its provisions contain a private right of action allowing for civil enforcement. *See* § 10-845(4); § 10-846(4). For example, § 10-845(4) permits "any individual aggrieved by a violation . . . to bring a civil action in a court of competent jurisdiction against a county, city, department or agency that employs a person violating [§ 10-845]." § 10-845(4); *see also* § 10-846(4). Moreover, zooming out, Bill 260060 was sent to Mayor Parker's Office as a part of a larger package of bills colloquially termed "ICE Out." ECF No. 3-1 at 15 n.3 (citing David Chang, et al., *Mayor Parker signs all 'ICE Out' bills in Philly except for mask ban*, NBC10 PHILADELPHIA (May 7, 2026), https://www.nbcphiladelphia.com/news/local/mayor-parker-signs-all-ice-out-bills-in-phillyexcept-for-mask-ban/4398543/). Therefore, the context in which the Bill was developed and passed suggests intended selective enforcement against at least a subset of federal officers.

Courts may also consider "what the enforcer has said about enforcement plans." *Nat'l Shooting Sports Found.*, 80 F.4th at 221. Earlier this year, District Attorney Krasner proclaimed his intention to "arrest" and "put handcuffs" on federal agents who break the law. ECF No. 3-1 at 19 (citing Tom MacDonald, *'We will arrest you': District attorney, sheriff double down on warnings to arrest ICE agents in Philly*, WHYY (Jan. 14, 2026), https://whyy.org/articles/philadelphia-ice-agents-rochelle-bilal-larry-krasner/). In their Opposition, Defendants point out that District Attorney Krasner's statements "were not made in relation to the Bill or the Bill's enforcement." ECF No. 18 at 15. True, but that is not dispositive. At a minimum, his statements serve as another data point from which the Court can reasonably

deduce plans for future enforcement of a Bill that purports to regulate federal officers and to impose penalties if they fail to comply.

In addition, District Attorney Krasner "launched a 'Fight Against Federal Overreach' or 'F.A.F.O.' coalition." ECF No. 1 ¶ 61 & n.8 (citing *District Attorney Larry Krasner, Reformed City Prosecutors, Announce the Launch of the F.A.F.O. Coalition to Support Prosecution Against Federal Agents Who Violate State Laws*, PHILA. DIST. ATTORNEY'S OFF. (Jan. 29, 2026), https://phillyda.org/news/district-attorney-larry-krasner-reformed-city-prosecutors-announce-the-launch-of-the-f-a-f-o-coalition-to-support-prosecution-against-federal-agents-who-violate-state-laws/ [hereinafter *Launch of the F.A.F.O. Coalition*]); *see also* ECF No. 3-1 at 19 & n.7. On its website, the Philadelphia District Attorney's Office explains that it participated in the F.A.F.O. Coalition "to assist in prosecuting federal law enforcement officers who violate state laws" and "to ensure that constitutional limits on federal power are actively enforced." *Launch of the F.A.F.O. Coalition*. District Attorney Krasner is further quoted as saying that, "[w]hen federal agents exceed their lawful authority, local prosecutors have both the power and the duty to act. The project exists to ensure that accountability is real, coordinated, and enforced through lawful institutions." *Id.* That language is sweeping and presents a credible threat of enforcement against federal officers that fail to comply with Bill 260060.

Perhaps most importantly, conspicuously absent from Defendants' Opposition is any indication, statement, or declaration from any Defendant that they do *not* plan to enforce the Bill against federal law enforcement officers should federal officers violate the ordinance. That absence speaks volumes. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 15 (2010) (finding that a group of plaintiffs sufficiently alleged a "credible threat" of enforcement in part because the Government declined to disavow prosecuting them if they resumed their support of the designated

15

terrorist organizations); *Nat'l Shooting Sports Found.*, 80 F.4th at 221 (finding no pre-enforcement standing where "the Attorney General has disavowed prosecuting [plaintiff] or its members just for participating in 'lawful commerce,' which is all [plaintiff] has said it wants to do"); *Cal. Trucking Ass'n*, 996 F.3d at 653 (holding that "the state's refusal to disavow enforcement of [a statute] against motor carriers during this litigation is strong evidence that the state intends to enforce the law and that [plaintiff's] members face a credible threat"); *California*, 819 F. Supp. 3d at 1121 (noting that "California has not disavowed its intent to enforce the two challenged Acts against federal officers[,]" which "is strong evidence that the state intends to enforce the law and that [plaintiff] face[s] a credible threat" (internal quotations and citation omitted)).

In sum, multiple signs converge on the conclusion that "there exists a credible threat of prosecution" against federal law enforcement officers that do not obey the requirements of Bill 260060, so the United States has demonstrated an "injury-in-fact." *Driehaus*, 415 U.S. at 159; *see also Babbitt*, 442 U.S. at 298 (finding pre-enforcement standing where plaintiffs faced "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement"). Moreover, there is an adequate "causal connection between the [United States'] injury" and the future conduct that it complains of. *Driehaus*, 415 U.S. at 158. And there is a strong likelihood that the United States' injury is redressable by a favorable decision that enjoins Defendants from enforcing the Bill against federal officers. *Id.* Accordingly, the United States has pre-enforcement standing to challenge the constitutionality of § 10-843, § 10-844, § 10-845, and § 10-846 of Bill 260060. *See California*, 819 F. Supp. 3d at 1121 (holding that the United States had demonstrated pre-enforcement standing in connection with "federal law enforcement officers who violate either the facial covering prohibition . . . or the visible identification provision" of two state statutes).

16

**B. Preliminary Injunction**

Having found that the United States has pre-enforcement standing to challenge Bill 260060, the Court next addresses whether the United States has adequately established the requisite factors supporting injunctive relief. For the following reasons, all factors weigh in the United States' favor and towards the entry of a preliminary injunction.

*1. Likelihood of Success on the Merits*

First, when a party moves for the entry of a preliminary injunction, it must demonstrate a likelihood of success on the merits of its claims. *Winter*, 555 U.S. at 20. "For that factor, the moving party must show that there is a reasonable chance, or probability, of winning." *KalshiEX, LLC*, 172 F.4th at 226. In its Motion, the United States asserts a facial challenge to § 10-843, § 10-844, § 10-845, and § 10-846 of Bill 260060, arguing that these provisions violate the Supremacy Clause of the Constitution. *See* ECF No. 3-1 at 20. Specifically, the United States contends that "Bill 260060 is invalid as it pertains to federal officers because it purports to regulate the Federal Government directly[,]" which is impermissible under the doctrine of intergovernmental immunity. *Id.* Accordingly, the United States argues that it "is likely to succeed on the merits." *Id.* at 28.

In their Opposition, Defendants contest whether the Bill implicates the intergovernmental doctrine and whether the Bill directly regulates the federal government, rather than merely having a "remote" impact "on a federal function." ECF No. 18 at 16, 18. Because the Bill contains exceptions that still permit the use of facial coverings, Defendants argue that "[t]he level of interference that other courts [have] found violative of intergovernmental immunity . . . is not present here." *Id.* at 18, 22.

17

"As every schoolchild learns, our Constitution establishes a system of dual sovereignty between the States and the Federal Government." *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991). But when there is conflict between the two sovereign authorities, the Supremacy Clause ensures that federal law controls. *See CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 320 (3d Cir. 2025). The Supremacy Clause provides that the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. Consistent with this mandate, the United States Supreme Court has long recognized that the "states have no power . . . to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by congress to carry into execution the powers vested in the general government." *McCulloch*, 17 U.S. at 436; *see also CoreCivic, Inc.*, 145 F.4th at 319 ("Just as the federal government cannot control a state, so too a state cannot control the federal government.").

In its Motion, the United States invokes the intergovernmental immunity doctrine, *see* ECF No. 3-1 at 20, which flows from the Supremacy Clause and "generally immunizes the Federal Government from state laws" that either (1) "directly regulate" or (2) "discriminate against it." *United States v. Washington*, 596 U.S. 832, 835 (2022); *see also CoreCivic, Inc.*, 145 F.4th at 321 (same). Under this doctrine, the "activities" of the federal government are "shielded by the Supremacy Clause from direct state regulation unless Congress provides 'clear and unambiguous' authorization for such regulation." *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 180 (1988) (citation omitted); *see also Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are free from regulation by any state."). A state directly regulates the federal government if it "'places [either] a prohibition' or mandate on" it. *CoreCivic, Inc.*, 145 F.4th at 321 (quoting *Hancock v. Train*, 426 U.S. 167, 180 (1976)). Put another way, "[a] direct

regulation is one that 'lays hold of' federal officers 'in their specific attempt to obey orders and requires qualifications in addition to those that the [federal] Government has pronounced sufficient.'" *United States v. California*, 173 F.4th 1060, 1067 (9th Cir. 2026) (quoting *Johnson v. Maryland*, 254 U.S. 51, 57 (1920)).  In their Opposition, Defendants do not assert that they have congressional authorization to implement and enforce the requirements contained within § 10-843, § 10-844, § 10-845, and § 10-846 of Bill 260060 against federal law enforcement officers. Accordingly, these provisions violate the Supremacy Clause if they are found to either directly regulate the federal government or discriminate against it.

Here, the United States contends that § 10-843, § 10-844, § 10-845, and § 10-846 directly regulate federal agencies and officers in contravention of the Constitution.  *See* ECF No. 3-1 at 22–28.  The Court agrees.  By their express terms, each provision impermissibly seeks to "impose[] conditions upon 'a function of government,' and regulate[] 'the right to carry on the business' of the federal government."  *California*, 173 F.4th at 1067 (quoting *Mayo*, 319 U.S. at 447).  This type of direct regulation of the federal government by a municipality is blatantly impermissible, so the United States has demonstrated a reasonable likelihood of success on the merits of its Supremacy Clause claims.

Start, for example, with § 10-843 of the Bill.  § 10-843(2) provides that "a law enforcement officer is guilty of criminal concealment if the law enforcement officer, while performing official duties and interacting with the public . . . wears a mask, facial covering, disguise or any other garment that obscures the identity of the law enforcement officer."  § 10-843(2)(a).  Within that same section, "Law Enforcement Officer" is defined as "[a]ny 'peace officer' as defined in 18 Pa.C.S. § 501 . . . , including but not limited to local, state or *federal* officers."  § 10-843(1)(a) (emphasis added).  The same provision also criminalizes other forms of "concealment" by federal

law enforcement officers, such as "[i]ntentionally obscur[ing], cover[ing], remov[ing] or otherwise conceal[ing] a badge, tag, label or other identifying information required to be visibly displayed[,]" or "[u]sing a vehicle in the course of official duties that does not contain clear identifying information for the entity that employs the law enforcement officer." § 10-843(2)(b)–(c).

It is therefore easy to "see the [Bill] for what it really is." *CoreCivic, Inc.*, 145 F.4th at 329. In no uncertain terms, § 10-843 explicitly seeks to control how federal law enforcement officers perform their governmental duties and conduct operations. Indeed, the Bill goes so far as "to override the federal government's power to determine whether, how, and when to publicly identify its officers." *California*, 173 F.4th at 1067. For purposes of direct regulation, it makes no difference that Bill 260060 applies not only to federal officers, but to local and state officers as well: "[t]he Supremacy Clause prohibits States from enacting a law that directly regulates federal operations even if the law regulates state operations in the same manner." *Id.* Because § 10-843 "aims to regulate the manner and conditions under which federal agents can enforce federal law[,]" it impermissibly seeks to "regulate[] the performance of 'governmental action[s]' which are 'carried on by the United States itself.'" *Id.* (quoting *Mayo*, 319 U.S. at 448).

§ 10-844, § 10-845, and § 10-846 are equally troubling and fare no better. Each provision likewise defines "Law Enforcement Officer" as explicitly "including . . . *federal* officers." § 10-844(1)(a) (emphasis added); *see also* § 10-845(1)(a); § 10-846(1)(a). And each provision purports to impose further conditions and restrictions as to how federal law enforcement officers perform their federal functions. For instance, § 10-844(2) makes it illegal for federal law enforcement officers, "while performing official duties and interacting with the public," to "fail[] to . . . [u]se a vehicle that contains clear identifying information for the entity that employs the law enforcement officer which is visible to individuals other than such law enforcement officer." § 10-844(2)(d).

20

In addition, § 10-845(2) provides that "a [federal] law enforcement officer is liable for tortious concealment if the law enforcement officer . . . [i]ntentionally obscures, covers, removes or otherwise conceals a badge, tag, label or other identifying information required to be visibly displayed."  § 10-845(2)(b).  § 10-846(2) imposes civil liability for federal law enforcement officers who "fail[] to . . . [p]roduce a badge, tag or label upon request."  § 10-846(2)(b).  Therefore, each of the provisions that the United States challenges within Bill 260060 seeks to directly regulate a federal agent in the performance of a federal function.

In a transparent attempt to downplay the regulatory nature of the Bill, Defendants argue that "[f]or many federal, state, and local law enforcement officers" (but not all), "the Bill would be irrelevant."  ECF No. 18 at 24.  Moreover, Defendants reiterate that the Bill contemplates "a number of circumstances where a federal agent could wear a mask without facing liability[,]" and contend that those exceptions mean that "any impact on a federal function [will be] remote, at best."  *Id.* at 18, 24.  According to Defendants, "the Bill will rarely, if ever, 'touch' the activities of federal law enforcement officers."  *Id.* at 18.  But Defendants' arguments miss the mark because, here, the Bill "do[es] much more than touch federal activity."  *CoreCivic, Inc.*, 145 F.4th at 325. The Bill fundamentally "prevents the federal government from choosing how . . . it will carry out a core federal function" by directly regulating how federal law enforcement officers investigate criminal activity, conduct undercover operations, interact with the public, and enforce federal laws. *Id.*  The Supremacy Clause bars the City of Philadelphia from doing so.  *See North Dakota v. United States*, 495 U.S. 423, 437–38 (1990) ("States may not directly obstruct the activities of the Federal Government.").  As the Ninth Circuit recently concluded in connection with California statutes seeking to impose similar prohibitions on federal officers,

> if a state law directly regulates the conduct of the United States, *it is void*
> *irrespective of whether the regulated activities are essential to federal functions or*

21

*operations, and irrespective of the degree to which the state law interferes with federal functions or operations.*

*California*, 173 F.4th at 1067 (emphasis added); *see also North Dakota*, 495 U.S. at 435 ("A state regulation is invalid . . . if it regulates the United States directly"); *Washington*, 596 U.S. at 838 (explaining that the Supreme Court has long "interpreted the Constitution as prohibiting States from interfering with or controlling the operations of the Federal Government").

Indeed, in recommending that Mayor Parker not sign Bill 260060, City Solicitor Garcia herself recognized its shaky foundations. *See* ECF No. 1 ¶ 60 (noting that Garcia "expressed concerns that the Bill poses 'significant legal problems, primarily concerning the authority of the City to regulate the conduct of federal officers when carrying out their duties under federal law'" (quoting Garcia Letter at 1)). And in declining to sign Bill 260060, the Court can only presume that Mayor Parker may have come to a similar conclusion.

If the Court were to accept Defendants' argument that the City of Philadelphia has the authority to directly control how federal officers carry out their law enforcement operations, consider, for a moment, what other municipalities across the United States might do. Indeed, there are more than one thousand municipalities in the State of Pennsylvania alone, and thousands more nationwide. Endorsing the City of Philadelphia's position would mean that each of those municipalities could decide whether to pass their own laws regulating how, when, where, and whether federal law enforcement officers can conceal their identities, which, in turn, would quickly devolve into a "patchwork" of local and "state laws [that] 'would defeat all the ends of government'" and cause serious national disruption. *CoreCivic, Inc.*, 145 F.4th at 328 (quoting *McCulloch*, 17 U.S. at 432). The Supremacy Clause acts to "shield[] federal power" from that "disruptive state collision." *Id.* (citing *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838 (1995) (Kennedy, J., concurring)); *see also Mayo*, 319 U.S. at 445 ("[I]t is necessary for uniformity that

22

the laws of the United States be dominant over those of any state. Such dominancy is required also to avoid a breakdown of administration through possible conflicts arising from inconsistent requirements."); *CoreCivic, Inc.*, 145 F.4th at 328 ("The Founding generation 'surely . . . did not intend' for federal operations and the exercise of federal powers to 'depend upon the discretion of the state governments.'" (quoting *McCulloch*, 17 U.S. at 362)); *McCulloch*, 17 U.S. at 432 ("If the states may tax one instrument, employed by the government in the execution of its powers, they may tax any and every other instrument. . . . This was not intended by the American people.").

Simply put, through Bill 260060, Defendants seek to directly regulate federal agents and law enforcement officers in the performance of their federal functions. Allowing the City of Philadelphia to "do that would 'chang[e] totally the character of' our federal system by 'transfer[ring] the supremacy, in fact, to" a municipality. *CoreCivic, Inc.*, 145 F.4th at 329 (quoting *McCulloch*, 17 U.S. at 432). The Constitution prevents the City of Philadelphia from doing so; instead, "intergovernmental immunity protects that supremacy." *Id.* For these reasons, the United States has demonstrated that it has "a reasonable chance, or probability, of winning[,]" so the first *Winter* factor weighs in favor of the United States. *KalshiEX, LLC*, 172 F.4th at 226 (internal quotations and citation omitted).

### 2. Irreparable Harm

Next, the United States argues that it will face irreparable harm in the absence of injunctive relief. *See* ECF No. 3-1 at 28–33. First, the United States contends that "[i]rreparable harm necessarily results from the enforcement of a state or local law that violates the Supremacy Clause." *Id.* at 28. Second, the United States argues that the Bill "endanger[s] federal officers" by "seek[ing] to publicly expose their personal identities" during a time in which violence has been escalating against them. *Id.* at 29 (citing ECF No. 3-6 ¶¶ 6–12). Third, the Bill's exceptions do

23

not "sufficiently account for instances in which federal officers may interact with the public" in the course of carrying out their official duties. *Id.* at 29–30. Fourth, the United States argues that compliance with the Bill will hinder the effectiveness of federal law enforcement operations and allow "suspects who recognize officers" to "evade apprehension and obstruct enforcement efforts." *Id.* at 30. Due to these concerns, the United States explains that federal officers regularly "deploy unmarked vehicles as a critical and congressionally sanctioned tool for conducting undercover operations, surveillance, and other sensitive" activities. *Id.* Finally, the United States emphasizes that allowing one "municipality to criminalize federal officer conduct . . . sets a precedent that would fragment federal operations across jurisdictions nationwide." *Id.* at 32.

In their Opposition, Defendants reiterate their position that the United States has not demonstrated a likelihood of success on the merits and, as such, cannot establish irreparable harm. ECF No. 18 at 24. Defendants also assert that the declarations submitted by the United States "provide only generalized descriptions of potential threats" that federal law enforcement officers might face when performing their duties, which is insufficient for establishing irreparable harm. *Id.* at 25 (emphasis omitted). Moreover, Defendants point out that the Bill contains an exception for "officers involved in any SWAT and other tactical operations[,]" and thus does not apply to "many surveillance and undercover operations." *Id.* at 25–26. Defendants also argue that the Bill does not require the "detailed disclosure" that the United States describes in its Motion. *Id.* at 26.

In addition to demonstrating a reasonable likelihood of success on the merits, a party seeking the entry of a preliminary injunction must establish that "it will be irreparably injured . . . if relief is not granted." *Reilly*, 858 F.3d at 176 (internal quotations and citation omitted); *see also Winter*, 555 U.S. at 20. Put another way, the movant "must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial." *KalshiEX, LLC*, 172 F.4th

at 231 (internal quotations and citation omitted).  Moreover, courts have found that "[w]hen enforcement actions are imminent . . . there is no adequate remedy at law[,]" *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992), and that "the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

Here, the United States has sufficiently demonstrated that it will suffer irreparable harm absent injunctive relief.  First, as the Ninth Circuit recently held, allowing Defendants "to enforce a [Bill] invalid under the doctrine of intergovernmental immunity" will "necessarily result[]" in irreparable harm to the United States and its officers, agents, and employees.  *California*, 173 F.4th at 1069.  Indeed, if a criminal enforcement action is initiated by the Philadelphia District Attorney against a federal agent due to the agent's noncompliance with the Bill, "the damage is done[,]" which "is the essence of irreparability."  *Space Expls. Techs. Corp. v. Nat'l Labor Rels. Bd.*, 151 F.4th 761, 780 (5th Cir. 2025).  Since the United States has demonstrated a likelihood of success on its claims that Bill 260060 violates the Constitution, strong evidence of irreparable harm flows from that violation.  *See Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (explaining that in the context of a constitutional claim, if a plaintiff "shows he is likely to prevail on the merits, that showing usually demonstrates he is suffering irreparable harm"); *cf. Schrader*, 74 F.4th at 128 ("The DA concedes that if the Law abridges the First Amendment, enforcing it against [plaintiff] would irreparably injure her.").

Second, the United States has identified multiple injuries that may occur to federal agents and law enforcement officers should its officers be required to comply with Bill 260060.  Contrary to Defendants' contention, the declarations that the United States submitted do not present merely "generalized descriptions of potential threats."  ECF No. 18 at 25 (emphasis omitted).  Rather, the

United States provided several examples of harm that has materialized from public identification of its officers. *See, e.g.*, ECF No. 3-5 ¶¶ 19–26; ECF No. 3-6 ¶¶ 9(a)–(m), 10–11. For instance, Thomas Hodnett, the Special Agent in Charge of the DEA's Philadelphia Field Division, stated that "DEA Special Agents do not always visibly identify themselves as DEA" because "most DEA investigations require Special Agents to conduct surveillance, meet with confidential informants, and engage in undercover operations." ECF No. 3-4 ¶ 16. The Special Agents' "ability to do [so] safely depends on not being identified as law enforcement[,]" and "[w]earing a facial covering during an enforcement operation . . . can mitigate . . . threat[s] to Agents' safety." *Id.* ¶¶ 16–17. Mr. Hodnett also elaborated on a recent example: "in June 2025, the image of a DEA Special Agent was posted on the social network BlueSky, with a caption 'Trying to identify any of these FBI, Homeland Security, and ATF goons who invaded a Minneapolis community to kidnap and terrorize its members.'" *Id.* ¶ 18. Afterwards, "[a]nother BlueSky user followed with a post identifying the DEA Special Agent by name and title and citing the use of multiple facial recognition models to match the image in question to the agent's picture on another site." *Id.* In addition to efforts to publicly "unmask" federal agents, the United States identified other harms that may flow from adoption and enforcement of the Bill against the federal government, such as (1) the assault, "intimidati[on,] and harass[ment]" of federal employees and their family members, *see* ECF No. 3-5 ¶¶ 19, 21, 25; (2) the placement of "targeted bounties for the murders of" federal employees, *id.* ¶ 22; (3) obstruction and interference with the federal government's "ability to apprehend individuals who pose significant risks to national security and public safety," *id.* ¶¶ 30–31; and (4) "chill[ing] officers and thus federal operations," *id.* ¶ 32.

Furthermore, as explained above, Defendants have also "threatened" federal law enforcement agents "with civil and criminal penalties" for noncompliance. *KalshiEX, LLC*, 172

F.4th at 231.  § 10-843(4) provides that "[a] violation of this section shall be a summary offense and upon conviction thereof, a violator shall be sentenced to pay a fine pursuant to Philadelphia Code § 1-109 per incident or undergo imprisonment for a period not exceeding ninety (90) days, or both, in addition to any other penalties imposed."  § 10-843(4).  § 10-843(5) also gives the Philadelphia District Attorney the right to bring a criminal enforcement action "against any law enforcement officer under this section."  § 10-843(5); *see also* § 10-844(4)–(5).  In addition to criminal repercussions, certain provisions within the Bill provide for civil penalties and a private right of action.  *See* § 10-845(4)–(5); § 10-846(4)–(5).  Therefore, the impending penalties that the United States will face if it does not comply with the Bill provide further support for its contention that it has no other adequate remedy at law.  *KalshiEX, LLC*, 172 F.4th at 231.

In sum, the United States has presented evidence indicating that enforcement of Bill 260060 will cause irreparable harm to the federal government in the absence of a preliminary injunction.  Accordingly, the second threshold factor of irreparable harm weighs strongly in favor of the United States, too.

### 3.  *Balance of the Equities and the Public Interest*

Finally, the Court turns to the merged factors: the balance of the equities and the public interest.  *Id.* at 225.

The United States argues that it is in the public interest to enjoin enforcement of the Bill because "there is no public interest in a state or locality violating the Supremacy Clause by directly regulating federal law enforcement."  ECF No. 3-1 at 34.  In addition, the United States contends that the public interest is served by protecting the safety of federal law enforcement officers, "removing unlawful impediments to" their operations, and preserving "effective federal law enforcement" that would otherwise be "curtailed by enforcement of the ordinance."  *Id.* at 34–35.

It is also "not in the public interest to require federal officers to comply with varying state and local standards for facial coverings and identification of officers and vehicles when the federal policy is designed to comply with federal law." *Id.* at 34. Furthermore, the United States asserts that any hardship the City of Philadelphia will experience from the entry of a preliminary injunction will be minimal as "Philadelphia can pursue accountability objectives through means that do not unconstitutionally regulate federal officers." *Id.* at 35. Accordingly, the United States argues that the overall balance of the equities weighs in its favor. *Id.*

In their Opposition, Defendants argue that any purported harm to the federal government from enforcement of Bill 260060 "is minimal[,]" and they fault the United States for not specifically identifying federal statutes that will be "frustrate[d]" by compliance with the Bill. ECF No. 18 at 27. Defendants also contend that "[t]he goals of the Bill are noble[,]" and note that it was aimed at "maintaining public trust and accountability." *Id.* at 27–28. Furthermore, Defendants speculate that "enforcement actions taken by unidentified federal agents in plainclothes . . . may cause community members to believe they are witnessing and/or victims of a crime, increasing the risk of a violent confrontation." *Id.* at 28.

Here, since the United States has demonstrated both a likelihood of success on the merits of its constitutional claims and irreparable harm, that "also tips the merged third and fourth factors decisively in [its] favor." *California*, 173 F.4th at 1069 (internal quotations and citation omitted); *see also Baird*, 81 F.4th at 1044 (noting that "a finding that the plaintiff is likely to succeed on the merits of [] a [constitutional] claim sharply tilts in the plaintiff's favor both the irreparable harm factor, and the merged public interest and balance of harms factors" (internal citations omitted)); *Sec. & Exch. Comm'n v. Chappell*, 107 F.4th 114, 139 (3d Cir. 2024) ("As a practical matter, if a plaintiff demonstrates both likelihood of success on the merits and irreparable injury, it almost

always will be the case that the public interest will favor the plaintiff." (internal quotations and citation omitted)). Courts routinely find that "the public interest [is] not served by the enforcement of an unconstitutional law." *N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 389 (3d Cir. 2012) (internal quotations and citation omitted); *see also Schrader*, 74 F.4th at 128 ("'[T]he enforcement of an unconstitutional law vindicates no public interest.'" (quoting *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 114 (3d Cir. 2013))); *Baird*, 81 F.4th at 1042 ("[I]t it always in the public interest to prevent the violation of a party's constitutional rights." (internal quotations and citation omitted)); *cf. KalshiEX, LLC*, 172 F.4th at 232 ("If the Act preempts New Jersey law, then the public interest is best served by enforcing the Act."). As explained in detail above, the United States has demonstrated a likelihood that it will succeed on its arguments that § 10-843, § 10-844, § 10-845, and § 10-846 of Bill 260060 directly regulate federal officers in violation of the Constitution, so there can be no public interest in enforcing those provisions against the federal government, notwithstanding the motivations that may have spurred their adoption.

Accordingly, "[b]ecause the United States has shown a likelihood that the [Bill] violates the Supremacy Clause, it has also shown that both the public interest and balance of the equities tip" the scale in its favor. *California*, 173 F.4th at 1069 (internal quotations and citations omitted). The Court thus finds that the final two *Winter* factors weigh decisively towards the entry of a preliminary injunction.

## IV.   **CONCLUSION**

For the foregoing reasons, the Court will **GRANT** the Government's Motion for a Preliminary Injunction (ECF No. 3). The Court **PRELIMINARILY ENJOINS** Defendants, the Defendants' officers, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with any of the Defendants, from implementing or enforcing Section

2, § 10-843, § 10-844, § 10-845, § 10-846 of Philadelphia City Council Bill 260060 as to federal agencies and officers.  An appropriate Order will follow.

BY THE COURT:

/s/ Chad F. Kenney

CHAD F. KENNEY, JUDGE