**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF PHILADELPHIA; CHERELLE PARKER, Mayor of Philadelphia, in her official capacity; LAWRENCE KRASNER, District Attorney of Philadelphia, in his official capacity; RENEE GARCIA, City Solicitor of Philadelphia, in her official capacity,<br><br>Defendants. | **AMENDED COMPLAINT**<br><br>No. 2:26-cv-4208 |

Plaintiff, the United States of America, by and through its undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

**INTRODUCTION**

1. On April 23, 2026, the Philadelphia City Council enacted a seven-bill package known as the "ICE Out" legislation, restricting how federal law enforcement personnel may operate within the City and limiting the City's cooperation with federal agencies. Two of those bills are at issue here.

2. The federal removal scheme for criminal aliens follows an order in which a State or locality convicts an unlawfully present defendant of a crime and imposes a term of imprisonment; once that sentence is served in state or local custody, the Federal Government takes custody to remove the individual. Congress required exactly that sequence for aliens convicted of controlled-substance offenses, crimes involving moral turpitude, aggravated felonies, and certain firearms and terrorism offenses, mandating that the Attorney General take such an alien into

custody "when the alien is released" from state or local custody, not before. *See* 8 U.S.C. §§ 1226(c), 1227(a); *see also* 8 U.S.C. § 1231(a) (detention during removal period for criminal aliens). Detainers exist to make that transfer possible: they tell a city or State already holding a convicted criminal alien that federal custody commences once the city or State sentence ends. *See* 8 U.S.C. § 1357(d); 8 C.F.R. § 287.7.

3. Philadelphia, however, has foreclosed that detainer mechanism altogether by guaranteeing in advance, by ordinance, that it will never honor a detainer. Bill 260059, subsection (4) bars every City agency and employee from continuing to hold a person, once eligible for release, for any reason connected to a detainer—no matter the underlying crime, no matter how little time between the end of an alien's sentence and federal custody arriving to take the alien.

4. The choice Congress preserved for the City has been replaced with a blanket refusal that applies in every case. That is no longer a City declining federal cooperation on its own terms; it is a standing assurance that the federal handoff Congress built into federal immigration law will never happen within Philadelphia, whatever the circumstances. A law that requires zero cooperation *ex ante* obstructs the federal scheme and is thus preempted for that reason.

5. Bill 260060 presents a different problem entirely. It does not withhold City cooperation from anyone, but rather regulates federal law enforcement officers directly—in carrying out any federal duty, not just immigration enforcement—by criminalizing the use of certain federally permitted uniform and identification modifications while federal officers are performing official duties in Philadelphia. No municipality has authority to dictate how federal law enforcement officers conduct their duties while enforcing federal law. That is direct regulation of the Federal Government, and the intergovernmental immunity doctrine forbids that. *United States v. Washington*, 596 U.S. 832, 838 (2022) (The Supremacy Clause "prohibit[s] state laws

that *either* regulat[e] the United States directly *or* discriminat[e] against the Federal Government….”); *CoreCivic, Inc. v. Governor of New Jersey*, 145 F.4th 315, 321 (3d Cir. 2025) (“Intergovernmental immunity shields the federal government from direct or discriminatory state regulation.”). Indeed, this Court has granted a preliminary injunction against the enforcement of Bill 260060 for these same reasons.

6. The United States brings this action to permanently enjoin Bill 260059(4) and Bill 260060—the former because it obstructs a congressional alien removal scheme and the latter because it directly regulates federal law enforcement officers and agencies.

**JURISDICTION AND VENUE**

7. The Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

8. Venue is proper under 28 U.S.C. § 1391(b)(1) because all defendants reside in this district.

9. The Court has the authority to provide the relief requested under 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent equitable powers.

**PARTIES**

10. Plaintiff, the United States of America, enforces federal laws through its Executive agencies. Those agencies include but are not limited to the Department of Justice and its component law enforcement agencies—e.g., the Federal Bureau of Investigation (FBI) and the Drug Enforcement Administration (DEA)—and the Department of Homeland Security (DHS) and its component law enforcement agencies—e.g., U.S. Immigration and Customs Enforcement (ICE) (which includes Homeland Security Investigations (HSI)) and U.S. Customs and Border Protection (CBP).

11. Defendant City of Philadelphia is a municipality within the Commonwealth of Pennsylvania. The City enacted Bill 260059 and Bill 260060 and is responsible for enforcing the challenged provisions of both.

12. Defendant Cherelle Parker is the Mayor of Philadelphia and is responsible for overseeing the City of Philadelphia, including the City agencies, officials, and employees charged with implementing the challenged provisions of Bill 260059 and Bill 260060. She is being sued in her official capacity.

13. Defendant Lawrence Krasner, District Attorney, leads Philadelphia's District Attorney's Office, which is charged with investigating and criminally prosecuting violations of the challenged provisions of Bill 260060. He is being sued in his official capacity.

14. Defendant Renee Garcia is the Solicitor of Philadelphia, and is responsible for legally advising city officials within the City of Philadelphia and for enforcing the challenged civil liability provisions of Bill 260060. She is being sued in her official capacity.

**LEGAL AND FACTUAL BACKGROUND**

**THE SUPREMACY CLAUSE AND FEDERAL LAW ENFORCEMENT**

15. The Supremacy Clause of the United States Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

16. The preemption doctrine provides that federal interests edge out state interests when federal and state law "clash." *North Dakota v. United States*, 495 U.S. 423, 435 (1990); *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477-79 (2018). Preemption is typically categorized as express, field, or conflict preemption. *Crosby v. Nat'l Foreign Trade Council*, 530

U.S. 363, 372-73 (2000). Express preemption occurs when Congress includes express language within the statute indicating its preemptive intent. *Id.* at 372. State law is also naturally preempted to the extent of any conflict with a federal statute. *Id.* That includes, for example, if it is impossible to comply with both state and federal law, and where the challenged law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 373; *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

17. The Supremacy Clause also incorporates principles of intergovernmental immunity, and thus, a state enactment is invalid if it "regulat[es] the United States directly or discriminat[es] against the Federal Government or those with whom it deals." *Washington*, 596 U.S. at 838 (citation omitted).

18. The Constitution affords Congress the power to "establish an uniform Rule of Naturalization," U.S. Const. art. I, § 8, cl. 4, and to "regulate Commerce with foreign Nations," U.S. Const. art. I, § 8, cl. 3. Exercising this authority, the Federal Government has devised an "extensive and complex" statutory scheme for the "governance of immigration and alien status." *Arizona v. United States*, 567 U.S. 387, 395 (2012). The Immigration and Nationality Act (INA) confers upon the Executive Branch broad authority to inspect, investigate, arrest, detain, and remove aliens who are unlawfully present in the United States. *See, e.g.*, 8 U.S.C. §§ 1182, 1225–29a, 1231. Taken together, "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396.

19. Congress has also codified basic principles of cooperation and comity between state and local authorities and the Federal Government. For example, federal law contemplates that removable aliens in state or local custody who have been convicted of state or local offenses will generally serve their state or local criminal sentences before being subject to removal but will be

taken into federal custody upon the expiration of their state prison terms. *See* 8 U.S.C. §§ 1226(c), 1231(a)(1)(B)(iii), (a)(4).

20. "Consultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. Congress has therefore directed that a federal, state, or local government entity or official "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [DHS] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373(a); *see id.* §§ 1373(b), 1644 (similar provisions).[1] These provisions both regulate and facilitate the Federal Government's regulation of illegal aliens.

21. Congress further sought to affirmatively penalize efforts to obstruct immigration enforcement by, among other things, knowingly (or in reckless disregard) prohibiting the "conceal[ing], harbor[ing], or shield[ing] from detection, or attempts to" accomplish the same, of any "alien in any place, including any building or any means of transportation." *Id.* § 1324(a)(1)(A)(iii).

22. The President has a constitutional duty to "take Care that the Laws be faithfully executed." U.S. Const. art. II § 3.

23. Subordinate officers in various federal agencies, including DOJ, DHS, and their components, assist the President in discharging that duty. *See Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 203–04 (2020); *see also Tennessee v. Davis*, 100 U.S. 257, 263 (1879) (stating that the Federal Government "can act only through its officers and agents").

[1] The United States was not a party to *Ocean Cnty. Bd. of Commissioners v. Att'y Gen. of State of New Jersey*, 8 F.4th 176 (3d Cir. 2021). The United States respectfully submits that the Third Circuit's decision was wrongly decided and, to the extent it bears on the claims presented here, would raise arguments not previously presented by the Appellants and reserves the right to seek further appellate review of the reasoning in that decision.

24. Because the Federal Government's authority to execute the laws "extend[s] over the whole territory of the Union, acting upon the States and upon the people of the States," federal officers "must act within the States." *Davis*, 100 U.S. at 263. Accordingly, federal law enforcement officers carry out their duties within the several states and their localities, including the City of Philadelphia.

25. For example, the DEA enforces our Nation's controlled substances laws. *See generally* The Controlled Substances Act (CSA), *codified as amended at* 21 U.S.C. §§ 801, *et seq.*

26. In carrying out that mission, the DEA investigates and aids in the prosecution of major violators of controlled substances laws; seizes and forfeits assets derived from illicit drug trafficking; and manages a national drug intelligence program in cooperation with federal, state, local, and foreign officials. *See* 28 C.F.R. § 0.100–0.101.[2]

27. As another example, the FBI is charged with rooting out violent crime, defending the homeland against terrorist attacks, and investigating and combating cybercrime, among other duties. It carries out this mission through numerous operations throughout the country and in partnership with federal, state, local, and foreign officials. *See id.* § 0.85.[3] DHS, through ICE and CBP, is principally responsible for enforcing our Nation's immigration laws, including the INA.

28. As part of its enforcement efforts, DHS, through HSI, also investigates transnational crime and threats, including incidents of human smuggling and human trafficking. *See* 8 U.S.C. §§ 1324, 1232.

29. In effectuating its mandate, an authorized immigration officer may issue an "immigration detainer" that "serves to advise another law enforcement agency that [DHS] seeks

[2] *See also* DEA, Mission Statement, https://perma.cc/7X26-8236.
[3] *See also* FBI, About, Mission and Priorities, https://www.fbi.gov/about/mission (last visited Aug. 24, 2026).

custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien." 8 C.F.R. § 287.7(a); *see* 8 U.S.C. §§ 1103(a)(3), 1226(a), (c), 1231(a), 1357(d). An immigration "detainer is a request that such agency advise [DHS], prior to release of the alien, in order for [DHS] to arrange to assume custody[.]" 8 C.F.R. § 287.7(a). These provisions both regulate and facilitate the Federal Government's regulation of illegal aliens.

30. DHS also may request that custody be extended by a period up to 48 hours, "in order to permit assumption of custody by the Department." *Id.* § 287.7(d) (stating that once a detainer is issued to a local agency, "such agency shall maintain custody of the alien for a period not to exceed 48 hours."). And in some instances, DHS is statutorily required, upon request from local authorities, to consider whether to issue a detainer for an alien in local custody. *See* 8 U.S.C. § 1357(d) (addressing violations of laws regulating controlled substances). DHS is also required to issue a detainer for certain aliens, including any alien who is "charged with, is arrested for, is convicted of, admits having committed, or admits committing acts which constitute the essential elements of any burglary, theft, larceny, shoplifting, or assault of a law enforcement officer offense, or any crime that results in death or serious bodily injury to another person[.]" 8 U.S.C. § 1226(c)(1)(E)(ii).

31. In the immigration context and beyond, federal law also empowers the Executive to provide for and dictate the conduct of federal law enforcement officers in carrying out their official duties. *See, e.g.*, 5 U.S.C. § 301 (authorizing the head of an Executive or military department to "prescribe regulations for the government of his department [and] the conduct of its employees"); 28 U.S.C. § 509 (vesting all functions of other officers, agencies, and employees of the Department of Justice in the Attorney General); 8 U.S.C. § 1103(a)(2) (giving the Secretary of Homeland Security the power to "control, direct[], and supervis[e]" all DHS employees).

32. Federal law similarly empowers the Executive to provide for and dictate federal law enforcement officers' uniforms and equipment, along with vehicle identification requirements, when carrying out their official duties. *See, e.g.*, 5 U.S.C. § 5901 (directing the head of each federal agency to furnish its employees a uniform or an allowance for a uniform); 29 U.S.C. § 668 (requiring heads of federal agencies to, as part of their occupational safety and health programs, acquire, maintain, and require the use of safety equipment, personal protective equipment, and devices reasonably necessary to protect employees); 10 U.S.C. § 723(b)(1) (providing exception to certain identification requirements to individuals who "do not wear a uniform or other distinguishing clothing or equipment in the regular performance of their official duties"); 40 U.S.C. § 609(b) (noting that regulations "may provide for exemptions when conspicuous identification would interfere with the purpose for which a vehicle is acquired and used").

**PHILADELPHIA CITY COUNCIL BILL 260059**

33. On April 23, 2026, Philadelphia City Council enacted Bill 260059. *See* Exhibit A. Mayor Cherelle Parker signed the Bill on May 7, 2026, and Bill 260059 became effective on July 6, 2026. *Id.* (stating that the "Ordinance shall take effect 60 days after it becomes law.").

34. Bill 260059 is codified at Title 21, Section 21-3706 of the Philadelphia Code, which imposes various prohibitions regarding immigration enforcement within the City.[4] In relevant part, subsection (4) mandates:

> No City agency, official, or employee shall stop, arrest, detain, or continue to detain a person after that person becomes eligible for release from custody or would otherwise be free to leave an encounter with an agency, official, or employee, based on any of the following:
>
> (a) An immigration detainer;

[4] Bill 260059 originally labeled the provisions under Section 21-3604, which has since been renumbered in the Philadelphia Code to Section 21-3706. This Amended Complaint will thus refer to the challenged section consistent with that renumbering.

(b) An administrative warrant; or
(c) Information or suspicion that a person is not present legally in the United States, or that the person has committed an immigration violation, or suspicion of violating 8 U.S.C. §§ 1253, 1304(c), 1306(a) and (b), 1325, and 1326.

*Id.* § 21-3706(4).

35. The Bill provides definitions of several terms, and defines "immigration detainer request" as "[a] request by a federal immigration enforcement agent to a federal, state, or local law enforcement agency that the law enforcement agency provide notice of release or maintain custody of an individual for purposes of civil immigration law enforcement, including Form I-247-A 'Immigration Detainer – Notice of Action', Form I-247D 'Immigration Detainer – Request for Voluntary Action', I-247X 'Request for Voluntary Transfer', Form I-247N 'Request for Voluntary Notification of Release', or any successor forms, as well as informal and verbal requests." *Id.* § 21-3706(1)(d).

36. The Bill defines "immigration enforcement agent" as "[a]ny federal employee or agent engaged in immigration enforcement operations, including, but not limited to, agents of United States Customs and Border Patrol [sic] (CBP), the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), and members of the National Guard or United States Armed Forces involved in immigration enforcement operations as applicable." *Id.* § 21-3706(1)(e). The term includes "[l]aw enforcement officers from local agencies who have signed such agreements." *Id.*

37. The Bill defines "administrative warrant" to include detainer requests. *Id.* § 21-3706(1)(k).

38. The Bill provides a private right of action by the City Solicitor or any aggrieved individual or entity against a county, city, department or agency employing the violator, subject to limitations. *See id.* § 21-3706(14).

39. The Bill indicates that City agencies and employees are not prohibited "from cooperating with federal authorities in the investigation or prosecution of criminal activity when required by law" and that the "Chapter shall [not] be construed to restrict compliance with federal or state law where such compliance is mandatory." *Id.* § 21-3706(16).

**PHILADELPHIA CITY COUNCIL BILL 260060**

40. On April 23, 2026, the City Council also enacted Bill 260060. *See* Exhibit B.

41. On May 7, 2026, Mayor Cherelle Parker declined to sign Bill 260060 but did not disapprove it. Despite the lack of signature, the Bill became law on May 8, 2026.[5] The challenged provisions of Bill 260060 were set to take effect on July 7, 2026.

42. On July 2, 2026, the Court granted a preliminary injunction enjoining Defendants from implementing or enforcing the challenged portions of the Bill. *See* ECF No. 22.

43. Mayor Parker's office stated that the decision not to sign Bill 260060 was made upon receiving a letter from Philadelphia City Solicitor Garcia which expressed concerns that the Bill poses "significant legal problems, primarily concerning the authority of the City to regulate the conduct of federal officers when carrying out their duties under federal law."[6] City Solicitor

[5] Section 2-202 of the Philadelphia Home Rule Charter provides that "Every ordinance shall, before it takes effect, be certified to the Mayor for approval. The Mayor shall sign the ordinance if the Mayor approves it, whereupon it shall become law. If the Mayor disapproves it, the Mayor shall return it to the Council with the reasons for the Mayor's disapproval at the first meeting thereof held not less than ten days after the Mayor receives it. . . . If the Mayor does not return the ordinance within the time required, it shall become law without the Mayor's approval."
[6] NBC10 PHILADELPHIA, *Mayor Parker signs all 'ICE Out' bills in Philly except for mask ban*, https://www.nbcphiladelphia.com/news/local/mayor-parker-signs-all-ice-out-bills-in-philly-except-for-mask-ban/4398543/ (last visited Aug. 24, 2026).

Garcia also referenced the recent Ninth Circuit decision in *United States v. California*, 173 F.4th 1060 (9th Cir. 2026), that granted a preliminary injunction against a similar identification law, finding it likely unconstitutional. The City Solicitor Garcia's letter also stated:

> As a general matter, the Mayor's signature on a bill reflects approval of its contents. *See* Charter § 2-202 ('The Mayor shall sign the ordinance if the Mayor approves it…'). Your signature on the Bill would likely signal not only support for the policy positions underlying the legislation, but also the Administration's commitment to enforce the Bill. Given the Bill's significant legal and operational challenges, signing this Bill, in my view, would send an inaccurate signal to the public that the Administration can legally or practically enforce the Bill.

*Supra* note 6. Notwithstanding this recommendation and in the absence of the Mayor's signature, the Bill still passed because she did not disapprove it. *See supra* note 5.

44. This Bill amended Title 10 of the Philadelphia Code, titled "Regulation of Individual Conduct and Activity," to prohibit "law enforcement officers from concealing their identity" and "require[s] officers to visibly display their badge and other official identifying information." Bill 260060, Preamble. The Bill also prohibits "the impersonation of law enforcement officers," and "provides for civil and criminal enforcement of violations, under certain terms and conditions." *Id*.

45. On its face, the Bill purports to apply these new rules to federal law enforcement officers by defining "Law Enforcement Officer" as any "peace officer" as defined in 18 Pa. C.S. § 501,[7] explicitly "including but not limited to local, state or federal officers." Phila. Code §§ 10-843(1)(a), 10-844(1)(a), 10-845(1)(a), 10-846(1)(a).

---

[7] "Any person who by virtue of his office or public employment is vested by law with a duty to maintain public order or to make arrests for offenses, whether that duty extends to all offenses or is limited to specific offenses, or any person on active State duty pursuant to 51 Pa.C.S. § 508 (relating to active duty for emergency). The term 'peace officer' shall also include any member of any park police department of any county of the third class."

Criminal Liability

46. Section 2 amends Title 10 of the Philadelphia Code to include Chapter 10-800, by adding § 10-843, titled "Criminal Concealment by a Law Enforcement Officer."

47. Under § 10-843(2), "a law enforcement officer is guilty of criminal concealment if the law enforcement officer, while performing duties and interacting with the public":

> (a) Wears a mask, facial covering, disguise or any other garment that obscures the identity of the law enforcement officer;
> (b) Intentionally obscures, covers, removes or otherwise conceals a badge, tag, label or other identifying information required to be visibly displayed;
> (c) Uses a vehicle in the course of official duties that does not contain clear identifying information for the entity that employs the law enforcement officer that is visible to individuals other than such law enforcement officer; or
> (d) Fails to identify themselves to a subject of arrest, holding or detention or to provide identifying information upon request to the subject of an arrest after an arrest has been made.

*Id.* § 10-843(2).

48. The facial coverings requirement includes only limited exceptions, such as wearing "a medical-grade mask or respirator necessary to prevent the transmission of airborne illnesses" or "for a religious purpose" or when "safeguard[ing] the face or head" or when "designed to protect against smoke or hazardous conditions during fire response or similar emergencies." *Id.* § 10-843(3)(a).

49. Aside from the limited facial covering exceptions, a law enforcement officer would not be found to violate subsection (2) "if the law enforcement officer is employed by a law enforcement agency that maintains and publicly posts a written policy pursuant to Section 10-848." *Id.* § 10-843(3)(b).

50. Section 10-843 provides that violations "shall be a summary offense" and convicted violators "shall be sentenced to pay a fine pursuant to Philadelphia Code § 1-109 per incident or undergo imprisonment for a period not exceeding ninety (90) days, or both, in addition to any other

penalties imposed." *Id.* § 10-843(4).

51. Section 10-843 authorizes the District Attorney to investigate and criminally prosecute violations. *Id.* § 10-843(5).

52. Section 2 of the Bill also adds § 10-844, titled, "Visible Badge Requirement," which imposes four requirements similar to ones in § 10-843. Under § 10-844, law enforcement officers are "guilty of criminal concealment if the law enforcement officer, while performing official duties and interacting with the public, fails to":

> (a) Visibly display a badge, tag or label clearly identifying the name, rank, and entity that employs that law enforcement officer at all times;
> (b) Identify themselves to a subject of arrest, holding or detention;
> (c) Produce a badge, tag or label upon request; or
> (d) Use a vehicle that contains clear identifying information for the entity that employs the law enforcement officer which is visible to individuals other than such law enforcement officer.

*Id.* § 10-844(2).

53. The only stated exception to § 10-844(2) applies "if the law enforcement officer is employed by a law enforcement agency that maintains and publicly posts a written policy pursuant to Section 10-848." *Id.* § 10-844(3).

54. Section 10-844 provides that violations "shall be a summary offense" and convicted violators "shall be sentenced to pay a fine pursuant to Philadelphia Code § 1-109 per incident or undergo imprisonment for a period not exceeding ninety (90) days, or both, in addition to any other penalties imposed." *Id.* § 10-843(4).

55. Section 10-844 authorizes the District Attorney to investigate and criminally prosecute violations. *Id.* § 10-844(5).

Civil Liability

56. Section 2 of the Bill also adds § 10-845, titled "Tortious Concealment by a Law Enforcement Officer," which is the civil analogue to § 10-843. Under § 10-845, "[a]ny person arrested in the City of Philadelphia has the right to know the identity of the arresting officer" and "a law enforcement officer is liable for tortious concealment if the law enforcement officer, while performing official duties and interacting with the public,"

> (a) Wears a mask, facial covering, disguise or any other garment that obscures the identity of the law enforcement officer, or fails to identify themselves to a subject of arrest, holding or detention;
> (b) Intentionally obscures, covers, removes or otherwise conceals a badge, tag, label or other identifying information required to be visibly displayed; or
> (c) Uses a vehicle in the course of official duties that does not contain clear identifying information for the entity that employs the law enforcement officer which is visible to individuals other than such law enforcement officer.

*Id.* § 10-845(2).

57. As in Section 10-843, the facial coverings requirement includes only limited exceptions, such as wearing "a medical-grade mask or respirator necessary to prevent the transmission of airborne illnesses" or "for a religious purpose" or when "safeguard[ing] the face or head" or when "designed to protect against smoke or hazardous conditions during fire response or similar emergencies." *Id.* § 10-845(3)(a).

58. Aside from the limited facial covering exceptions, a law enforcement officer would not be found to violate subsection (2) "if the law enforcement officer is employed by a law enforcement agency that maintains and publicly posts a written policy pursuant to Section 10-848." *Id.* § 10-845(3)(b).

59. Section 10-845(4) provides that "[t]he City Solicitor or any individual aggrieved by a violation of this Section or any entity a member of which is aggrieved by a violation of this Section may bring a civil action . . . against a . . . department or agency that employs a person

violating this Section." The statute of limitations for such an action "shall be three (3) years from the date the complainant knew or should have known of the alleged violation." *Id.* § 10-845(4).

60. Section 10-845 authorizes various remedies to a plaintiff in such an action, including a cease-and-desist order, compensatory or punitive damages, attorney fees or court costs, payment of a fine up to two thousand dollars ($2,000) for each violation, and other equitable relief. *Id.* § 10-845(5).

61. Similarly, Section 2 of the Bill includes § 10-846, titled, "Tortious Failure to Make an Identifying Badge Visible," which is the civil analogue to § 10-844. Under Section 10-846, law enforcement officers are "liable for tortious failure to make an identifying badge visible if the law enforcement officer, while performing official duties and interacting with the public, fails to":

> (a) Visibly display a badge, tag or label clearly identifying the name, rank, and entity that employs that law enforcement officer at all times;
> (b) Produce a badge, tag or label upon request; or
> (c) Use a vehicle that contains clear identifying information for the entity that employs the law enforcement officer which is visible to individuals other than such law enforcement officer.

*Id.* § 10-846(2).

62. The only stated exception to Section 10-846(2) applies if the law enforcement officer is "employed by a law enforcement agency that maintains and publicly posts a written policy pursuant to Section 10-848." *Id.* § 10-846(3).

63. Section 10-846(4) provides that "[t]he City Solicitor or any individual aggrieved by a violation of this Section or any entity a member of which is aggrieved by a violation of this Section may bring a civil action . . . against a . . . department or agency that employs a person violating this Section." The statute of limitations for such an action "shall be three (3) years from the date the complainant knew or should have known of the alleged violation." *Id.* § 10-846(4).

64. Section 10-846 authorizes various remedies to a plaintiff in such an action,

including a cease-and-desist order, payment of compensatory or punitive damages, attorney fees or court costs, payment of a fine up to two thousand dollars ($2,000) for each violation, and other equitable relief. *Id.* § 10-846(5).

<u>Policy Requirements</u>

65. Section 2 conditions relief from criminal and civil liability on the requirement that law enforcement agencies maintain and publicly post a written policy compliant with municipal standards. Section 2 amends Title 10 of the Philadelphia Code to include § 10-848, titled, "Law Enforcement Agency Policies." Under § 10-848(1), "[a] law enforcement agency operating in Philadelphia shall maintain and publicly post a written policy prohibiting officers from concealing their identity, and requiring officers to visibly display their badge and other official identifying information, when performing enforcement duties." Further, the policy must include, but is not limited to:

(a) A purpose statement affirming the agency's commitment to all of the following:

(.1) Transparency, accountability, and public trust;
(.2) Restricting the use of facial coverings to specific, clearly defined, and limited circumstances;
(.3) Restricting situations in which officers do not visibly display identification to specific, clearly defined, and limited circumstances.

(b) A requirement that all law enforcement officers not use a facial covering when performing their duties, subject to a list of narrowly tailored exemptions for the following:

(.1) Active undercover operations or assignments authorized by supervising personnel or court order.
(.2) Operations where personal protective gear is required for physical safety.
(.3) Protection of identity during prosecution.
(.4) Exigent circumstances, involving an imminent danger to persons or property, or the escape of a perpetrator, or the destruction of evidence, including if the officer is responding to those circumstances while off-duty.
(.5) When there is a specific, articulable, and particularized reason to

> believe identification would pose a danger to the physical safety of the officer.
> (.6) Applicable law governing occupational health and safety or reasonable accommodations.

*Id.* § 10-848(2).

66. Philadelphia has indicated its intent to enforce its laws against federal officers and agents. For example, District Attorney Lawrence Krasner said ICE agents who break the law in Philadelphia will be arrested, stating, "We will arrest you. We will put handcuffs on you. We will close those cuffs. We will put you in a cell."[8] DA Krasner went on to state, "We will do everything in our power to convict you and we will make sure you serve your entire sentence because Donald Trump has no power whatsoever to pardon you." *Id.* The District Attorney also launched a "Fight Against Federal Overreach" or "F.A.F.O." coalition to support "prosecuting federal law enforcement officers who violate state laws."[9]

**<u>BILLS 260059 AND 260060 ARE UNLAWFUL</u>**

67. While Congress permitted state and local jurisdictions to fully punish aliens for state criminal violations prior to removal, *see* 8 U.S.C. § 1231(a)(4)(A) (providing that, subject to limited exceptions, federal agents "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment"), Congress established a statutory scheme that clearly envisioned the Federal Government's being able to detain and remove those aliens once their state or local proceedings and sentences concluded.

68. Congress specified that the removal period begins immediately upon release from

---

[8] WHYY, *'We will arrest you': District attorney, sheriff double down on warnings to arrest ICE agents in Philly* (Jan. 14, 2026), https://perma.cc/SM23-WKHA.
[9] Philadelphia District Attorney's Office, *District Attorney Larry Krasner, Reformed City Prosecutors, Announce the Launch of the F.A.F.O. Coalition to Support Prosecution Against Federal Agents Who Violate State Laws* (Jan. 29, 2026), https://perma.cc/5HUA-EPZF.

state criminal custody, *id.* § 1231(a)(1)(B)(iii), and detention during that period is mandatory, *id.* § 1231(a)(2); *see also* 8 U.S.C. §§ 1226(c)(3), 1357(d) (directing immigration officers to obtain a detainer to facilitate the transfer of criminal aliens from state to federal custody). Congress granted this permission expecting that benefited States would then facilitate, or at the very least not obstruct, detention of criminal aliens by federal immigration authorities. Indeed, if DHS lacks knowledge of a criminal alien's release date from state custody, DHS cannot exercise its statutory responsibility of effecting an arrest upon the alien's release.

69. Bill 260059 obstructs federal immigration enforcement by, among other things, impeding the safe apprehension and detention of unlawfully present aliens who have been convicted of crimes. This Bill is thus both expressly and conflict preempted by federal immigration law.

70. Further, the challenged provisions of Bill 260060 imposing a ban on facial coverings and identification requirements for law enforcement officers and law enforcement vehicles constitute unlawful regulation of the Federal Government. *See Washington*, 596 U.S. at 838. Bill 260060 purports to mandate that federal law enforcement officers within Philadelphia comply with municipal prohibitions and requirements on facial coverings and identification and to subject those officers and their employing agencies to criminal and civil penalties, respectively, for noncompliance with those provisions.

71. While Bill 260060 contains limited exceptions, they do not exclude federal officers from its scope, and federal agents and agencies are not eligible for those exceptions unless the federal agency implements and publicly posts a written policy meeting the City's own standards. Moreover, although states and localities do not have authority to determine excepted activities and conduct of federal law enforcement officers, the exceptions nonetheless do not fully address

instances in which the identification requirement could impede federal operations, including, for example, surveillance and plainclothes operations.

72. Due to the nature of law enforcement operations, federal officers require flexibility to determine when to announce their identities and when to include identification on their official vehicles. For example, CBP and ICE have discretion on when they permit their officers and agents to wear facial coverings and whether to add or remove individual identifiers. These agencies also allow officers discretion as to when and what information is provided to a subject of arrest, holding, or detention, and what identification is provided to individuals upon request. For instance, federal regulations provide that "an immigration officer who is authorized to execute an arrest" announce themselves and the purpose of the arrest "as soon as it is practical and safe to do so." 8 C.F.R. § 287.8(c)(2)(iii). That is up to the agencies and officers based on the facts and circumstances in a particular case and cannot be subjected to bright-line or conflicting rules made by state or local governments. Removing this flexibility and requiring federal agencies and officers to comply with Philadelphia's stricter facial coverings and identification requirements would undermine officer safety and operational effectiveness.

73. Denying federal agencies and officers discretion in these areas would chill federal law enforcement, threatening the safety of communities in Philadelphia. Accordingly, Bill 260060 would prevent effective federal law enforcement within Philadelphia.

74. Indeed, this Court has determined that the Ordinance likely constitutes unlawful direct regulation of the Federal Government. *See also United States v. California*, 173 F.4th 1060 (9th Cir. 2026); *United States v. New York*, No. 1:26-CV-1360, 2026 WL 2225423 (N.D.N.Y. Aug. 3, 2026); *United States v. Commonwealth of Virginia*, No. 3:26-CV-545, 2026 WL 1909995 (E.D. Va. July 2, 2026).

**BILLS 260059 AND 260060 HARM THE FEDERAL GOVERNMENT AND THE PUBLIC**

75. The United States suffers a sovereign and irreparable injury from Bills 260059 and 260060, *cf. Arizona v. Yellen*, 34 F.4th 841, 851–53 (9th Cir. 2022); *Vt. Agency of Nat. Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 771 (2000); *United States v. City of Pittsburgh*, 757 F.2d 43, 45 (3d Cir. 1985). The United States has sovereign authority over immigration and managing federal law enforcement activities and, under the Supremacy Clause, need not cede that authority to Philadelphia.

76. Additionally, Bills 260059 and 260060 endanger the public, as well as federal law enforcement officers. *See generally United States v. City of Philadelphia*, No. 2:26-CV-4208, 2026 WL 1906075, at *4-*8, *12-*13 (E.D. Pa. July 2, 2026) (discussion on standing and irreparable harm regarding Bill 260060).

77. For instance, the Enforcement and Removal Operations (ERO) Office in Philadelphia reports that since Bill 260059's effective date of July 6, 2026, ERO Philadelphia has lodged 26 detainers with the City of Philadelphia. Of those detainers, 15 detainers were not honored, and the City released the subjects from custody, and 11 detainers remain active in the system, as the subjects are still incarcerated.

78. The crimes underlying the detainers that were not honored by the City included, for example, aggravated assault, attempts to cause serious bodily injury or cause injury with extreme indifference, strangulation of the throat or neck, harassment, recklessly endangering another person, failure to appear on a prior robbery charge, and manufacture, delivery, or possession of controlled substances with intent to manufacture or deliver.

79. Without these detainers being honored, ICE was only able to arrest a fraction of the aliens, with the remaining criminals ending up at-large. Moreover, ERO independently had to

develop operational leads and plan enforcement actions without the benefit of routine local law enforcement information sharing, thereby engaging in difficult and potentially dangerous efforts to re-arrest aliens who were previously in local custody. In rejecting congressionally authorized means of enforcing federal immigration law, Bill 260059 not only threatens and harms the United States' sovereign interest in the supremacy of federal law, specifically the INA, but also frustrates federal immigration enforcement itself.

80. Philadelphia has no lawful interest in assisting removable aliens convicted of state crimes in evading federal law enforcement. The City's prohibitions on detainers have thus endangered public safety, resulting in criminals being released into the public rather than turned over to immigration authorities for removal from the United States.

81. Moreover, compliance with Bill 260060 would endanger officers and reduce operational effectiveness by, among other things, subjecting them to standards that conflict with and differ materially from applicable federal standards and policies.

82. Federal law enforcement agencies cannot and will not comply with Bill 260060, which is unconstitutional and recklessly disregards officer safety, public safety, and federal operational needs.

83. Law enforcement historically has been a dangerous job but now is even more so. Protecting the personal identities of federal officers and by extension their families are necessary in part due to the increasing threats of targeted harassment and retaliation against federal officers and agents for simply doing their jobs enforcing the laws enacted by Congress. While such threats have always existed, the volatile political environment has increased such threats exponentially, requiring new tactics to mitigate the harm to officer safety and operational effectiveness.

84. For instance, members of the public photograph, film, and publish federal

enforcement actions online and include the personal identities of federal officers for the sole purpose of intimidation and harassment. This content is directly used by members of organized crime and transnational criminal organizations in serious and potentially deadly ways.

85. Some individuals photograph officers' faces and run them through facial recognition applications that search social media and doxxing sites such as, for example, ICESpy.org. Once a match is made, they often search for family members, including children, and disseminate this information online, allowing people to track, harass, and obstruct law enforcement. This opens officers up to harassment, tracking, and assaults in the performance of their duties in the field.

86. Facial coverings can prevent agitators from identifying and tracking officers, especially those using facial recognition or other tools. And while officers almost always wear tags identifying themselves as federal officers (with the exception of, for example, surveillance, undercover, or plainclothes operations), personal identifiers carry similar risks that can allow agitators to identify and harass individual officers. Protecting officers' personal identities is particularly important during high-risk enforcement operations involving individuals with violent criminal history, gang affiliations, transnational criminal organizations, and known or suspected terrorists.

87. Moreover, federal agencies, including but not limited to the FBI, DEA, and DHS, routinely deploy unmarked vehicles as a critical and congressionally sanctioned tool for conducting undercover operations, surveillance, and other sensitive law enforcement activities. *See* 41 C.F.R. § 102-34.155 ("Motor vehicles used primarily for investigative, law enforcement, intelligence, or security duties have an unlimited exception from displaying U.S. Government license plates and motor vehicle identification when identifying these motor vehicles would

interfere with those duties."); 31 U.S.C. § 1344 (authorizing use of government-owned vehicles for home-to-work transportation); 41 C.F.R. § 102-34.205 (same); *see generally* 28 U.S.C. § 533 (authorizing the Attorney General to appoint officials to conduct investigations and detect crimes against the United States). The use of unmarked vehicles in these missions in Philadelphia is essential to their success and to the safety of officers conducting them, as well as the general public.

88. Facial coverings and removal of personal and vehicle identifiers also prevent suspects from identifying officers who may be involved in future enforcement actions. Because suspects who recognize officers may take preemptive actions to evade apprehension and obstruct enforcement efforts, flexibility is critical for maintaining operational effectiveness, especially in areas where repeat offenders or organized criminal networks are prevalent. The existence of websites that contain information regarding individual officers' identities can also undermine undercover operations and plainclothes missions.

89. Finally, the threat of enforcement for noncompliance will only further exacerbate the chilling effects of these laws. Officers face a choice of whether to wear facial coverings or identify themselves and their agencies when it may be dangerous to themselves, others, and the operation, or face the threat of criminal and civil enforcement. Either option presents serious risks and harms and purposefully works to chill the enforcement of federal law.

90. Moreover, the challenged provisions of Bill 260060 plainly apply to federal law enforcement officers and agencies and carry criminal and civil penalties for noncompliance; numerous officers operating within Philadelphia routinely engage in the very conduct the ordinance proscribes; and the City has made clear its intention to enforce its provisions against them or their agencies.

91. Bill 260060 also harms public safety because obstructing federal enforcement

leaves dangerous individuals at large in Philadelphia, compromises undercover operations that protect the broader community against gangs and trafficking organizations, and risks pushing federal officers to scale back enforcement in the City—leaving residents with less protection than people in jurisdictions without such ordinances. Bystanders near enforcement actions also face added risk when officers' identities are compelled to be disclosed in real time.

92. More broadly, the public interest has an independent interest in the Federal Government's ability to carry out its enforcement functions without obstruction by Philadelphia's ordinances.

## **CLAIMS FOR RELIEF**

### **COUNT I**
### **VIOLATION OF THE SUPREMACY CLAUSE AND INA – SECTION 21-3706(4) OF THE PHILADELPHIA CODE (EXPRESS PREEMPTION) (CITY OF PHILADELPHIA AND MAYOR CHERELLE PARKER, IN HER OFFICIAL CAPACITY)**

93. Plaintiff hereby incorporates the preceding paragraphs of this Amended Complaint as if fully stated herein.

94. Express preemption occurs when Congress includes express language within the statute indicating its preemptive intent. *Crosby*, 530 U.S. at 372.

95. Bill 260059, codified at Section 21-3706(4) of the Philadelphia Code, is expressly preempted by 8 U.S.C. §§ 1373 and 1644's requirement that States or local government entities or officials "not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, [federal immigration officials] information regarding the citizenship or immigration status, lawful or unlawful, of any individual." 8 U.S.C. § 1373; *see id.* § 1644.

96. Section 21-3706(4) prohibits the City from providing a "notice of release" for purposes of civil immigration law enforcement. *Id.* § 21-3706(1)(d).

97. Section 21-3706(4) of the Philadelphia Code is thus expressly preempted by 8 U.S.C. §§ 1373, 1644.

**COUNT II**
**VIOLATION OF THE SUPREMACY CLAUSE AND INA – SECTION 21-3706(4) OF THE PHILADELPHIA CODE (CONFLICT PREEMPTION)**
**(CITY OF PHILADELPHIA AND MAYOR CHERELLE PARKER, IN HER OFFICIAL CAPACITY)**

98. Plaintiff hereby incorporates the preceding paragraphs of this Amended Complaint as if fully stated herein.

99. Conflict preemption includes, for example, where the challenged law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *Crosby*, 530 U.S. at 372-73 (citation omitted).

100. Bill 260059, codified at Section 21-3706(4) of the Philadelphia Code, "stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress." *United States v. Locke*, 529 U.S. 89, 109 (2000).

101. Federal law authorizes the use of immigration detainers and other mechanisms to assist in the arrest and removal of aliens. *See* 8 C.F.R. § 287.7; 8 U.S.C. §§ 1103(a)(3), 1225(d)(4), 1226(a), (c), 1231(a), 1357(d).

102. Moreover, efforts to hamper its federal immigration enforcement mandates are prohibited by imposing affirmative penalties on attempts to shield, harbor, or conceal aliens from detection by federal law enforcement. *See* 8 U.S.C. § 1324(a)(1)(A)(ii).

103. Nonetheless, Section 21-3706(4) of the Philadelphia Code prohibits City agencies, officials, or employees from "stop[ping], arrest[ing], detain[ing], or continu[ing] to detain a person after that person becomes eligible for release from custody or would otherwise be free to leave an encounter with an agency, official, or employee based on" an immigration detainer. It also

prohibits providing a "notice of release or maintain[ing] custody of an individual for purposes of civil immigration law enforcement[.]" *See id.* § 21-3706(1)(d). This prohibition on the discretion to maintain custody undermines 8 C.F.R. § 287.7(d), which contemplates that local agencies maintain custody for up to 48 hours to ensure the safe and orderly transfer of criminal aliens to federal authorities.

104. This prohibition frustrates the accomplishment and execution of federal immigration law, creates obstacles that undermine general federal immigration enforcement efforts, and inhibits cooperation underlying the immigration laws even when local officials wish to do so. *See* 8 U.S.C. §§ 1357(d), 1373, 1644.; 8 C.F.R. § 287.

105. Federal law does not contemplate any of these limitations on federal immigration authorities' ability to remove aliens who are unlawfully present in this country or otherwise enforce federal immigration law.

106. Section 21-3706 of the Philadelphia Code is thus preempted by federal immigration law in violation of the Supremacy Clause.

**COUNT III**
**VIOLATION OF THE SUPREMACY CLAUSE – SECTION 10-843 OF THE PHILADELPHIA CODE**
**(UNLAWFUL REGULATION OF THE FEDERAL GOVERNMENT)**
**(ALL DEFENDANTS)**

107. Plaintiff hereby incorporates the preceding paragraphs of this Amended Complaint as if fully stated herein.

108. The Supremacy Clause of the United States Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

109. The Supremacy Clause incorporates principles of intergovernmental immunity, and thus, a state enactment is invalid if it "regulat[es] the United States directly *or* discriminat[es] against the Federal Government or those with whom it deals." *Washington*, 596 U.S. at 838 (citation omitted).

110. Philadelphia's enforcement of Bill 260060, codified at Section 10-843 of the Philadelphia Code, against law enforcement officers from federal agencies constitutes unlawful regulation of the Federal Government. *See CoreCivic*, 145 F.4th at 321 (A state law unlawfully regulates the United States when it "'places [either] a prohibition' or mandate on the federal government." (quoting *Hancock v. Train*, 426 U.S. 167, 180 (1976))).

111. Section 10-843(2)(a) purports to ban federal agents from wearing facial coverings while performing their duties in Philadelphia and subjects those agents to enforcement for noncompliance including criminal penalties.

112. Section 10-843(2)(b) purports to require federal agents to display visible identification while performing their duties in Philadelphia and subjects those agents to enforcement for noncompliance, including criminal penalties.

113. Section 10-843(2)(c) purports to require federal agents to display visible identification of their respective federal agencies on their vehicles while performing their duties in Philadelphia and subjects those agents to enforcement for noncompliance, including criminal penalties.

114. Section 10-843(2)(d) purports to require federal agents to provide identification to a subject of arrest, holding, or detention while performing their duties in Philadelphia and subjects those agents to enforcement for noncompliance, including criminal penalties.

115. Section 10-843 therefore purports to directly regulate the Federal Government in

violation of the intergovernmental immunity doctrine.

116. Accordingly, Section 10-843 of the Philadelphia Code is invalid under the Supremacy Clause and its application to the Federal Government should be enjoined.

**COUNT IV**
**VIOLATION OF THE SUPREMACY CLAUSE – SECTION 10-844 OF THE PHILADELPHIA CODE**
**(UNLAWFUL REGULATION OF THE FEDERAL GOVERNMENT)**
**(ALL DEFENDANTS)**

117. Plaintiff hereby incorporates the preceding paragraphs of this Amended Complaint as if fully stated herein.

118. Philadelphia's enforcement of Bill 260060, codified at Section 10-844 of the Philadelphia Code, against federal law enforcement officers constitutes an unlawful regulation of the Federal Government.

119. Section 10-844(2)(a) purports to require federal agents to display visible identification while performing their duties in Philadelphia and subjects those agents to enforcement for noncompliance, including criminal penalties.

120. Section 10-844(2)(b) purports to require federal agents to provide identification to a subject of arrest, holding, or detention while performing their duties in Philadelphia and subjects those federal agents to enforcement for noncompliance, including criminal penalties.

121. Section 10-844(2)(c) purports to require federal agents to produce a badge, tag, or label upon request while performing their duties in Philadelphia and subjects those agents to enforcement for noncompliance, including criminal penalties.

122. Section 10-844(2)(d) purports to require federal agents to display visible identification of their respective federal agencies on their vehicles while performing their duties in Philadelphia and subjects those agents to state enforcement for noncompliance, including criminal

penalties.

123. Section 10-844 therefore purports to directly regulate the Federal Government in violation of the intergovernmental immunity doctrine.

124. Accordingly, Section 10-844 of the Philadelphia Code is invalid under the Supremacy Clause and its application to the Federal Government should be enjoined.

**COUNT V**
**VIOLATION OF THE SUPREMACY CLAUSE – SECTION 10-845 OF THE PHILADELPHIA CODE**
**(UNLAWFUL REGULATION OF THE FEDERAL GOVERNMENT)**
**(ALL DEFENDANTS)**

125. Plaintiff hereby incorporates the preceding paragraphs of this Amended Complaint as if fully stated herein.

126. Philadelphia's enforcement of Bill 260060, codified at Section 10-845 of the Philadelphia Code, against federal law enforcement officers and their employing agencies constitutes unlawful regulation of the Federal Government.

127. Section 10-845(2)(a) purports to ban federal agents from wearing facial coverings while performing their duties in Philadelphia and subjects those agents' employing agencies to enforcement for noncompliance including civil penalties.

128. Section 10-845(2)(a) purports to require federal agents to provide identification to a subject of arrest, holding, or detention while performing their duties in Philadelphia and subjects those agents' employing agencies to enforcement for noncompliance, including civil penalties.

129. Section 10-845(2)(b) purports to require federal agents to display visible identification while performing their duties in Philadelphia and subjects those agents' employing agencies to enforcement for noncompliance, including civil penalties.

130. Section 10-845(2)(c) purports to require federal agents to display visible

identification of their respective federal agencies on their vehicles while performing their duties in Philadelphia and subjects those agents' employing agencies to enforcement for noncompliance, including civil penalties.

131. Section 10-845 therefore purports to directly regulate the Federal Government in violation of the intergovernmental immunity doctrine.

132. Accordingly, Section 10-845 of the Philadelphia Code is invalid under the Supremacy Clause and its application to the Federal Government should be enjoined.

**COUNT VII**
**VIOLATION OF THE SUPREMACY CLAUSE – SECTION 10-846 OF THE PHILADELPHIA CODE**
**(UNLAWFUL REGULATION OF THE FEDERAL GOVERNMENT)**
**(ALL DEFENDANTS)**

133. Plaintiff hereby incorporates the preceding paragraphs of this Amended Complaint as if fully stated herein.

134. Philadelphia's enforcement of Bill 260060, codified at Section 10-846 of the Philadelphia Code, against federal law enforcement officers and their employing agencies constitutes an unlawful regulation of the Federal Government.

135. Section 10-846(2)(a) purports to require federal agents to display visible identification while performing their duties in Philadelphia and subjects those agents' employing agencies to enforcement for noncompliance, including civil penalties.

136. Section 10-846(2)(b) purports to require federal agents to produce a badge, tag, or label upon request while performing their duties in Philadelphia and subjects those agents' employing agencies to enforcement for noncompliance, including civil penalties.

137. Section 10-846(2)(c) purports to require federal agents to display visible identification of their respective federal agencies on their vehicles while performing their duties in

Philadelphia and subjects those agents' employing agencies to state enforcement for noncompliance, including civil penalties.

138. Section 10-846 therefore purports to directly regulate the Federal Government in violation of the intergovernmental immunity doctrine.

139. Accordingly, Section 10-846 of the Philadelphia Code is invalid under the Supremacy Clause and its application to the Federal Government should be enjoined.

## PRAYER FOR RELIEF

WHEREFORE, the United States respectfully requests the following relief:

A. That this Court enter a judgment declaring that Section 21-3706(4) of the Philadelphia Code, or any further renumbering of this ordinance, violates the Supremacy Clause and is therefore invalid as to detainers;

B. That this Court enter a judgment declaring that Sections 10-843, 10-844, 10-845, and 10-846 of the Philadelphia Code, or any renumbering of this ordinance, violate the Supremacy Clause and are therefore invalid as to federal agencies and officers;

C. That this Court permanently enjoin Defendants, as well as their successors, agents, servants, employees and attorneys, and all those working in concert with them, from enforcing Section 21-3706(4) of the Philadelphia Code, or any further renumbering of this ordinance, as to detainers;

D. That this Court permanently enjoin Defendants, as well as their successors, agents, servants, employees and attorneys, and all those working in concert with them, from enforcing Sections 10-843, 10-844, 10-845, and 10-846, or any renumbering of this ordinance, against federal agencies and officers;

E. That this Court award the United States its costs and fees in this action; and

F. That this Court award any other relief it deems just and proper.

DATED: August 24, 2026

Respectfully submitted,

STANLEY E. WOODWARD, JR.
Associate Attorney General

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

ANNA EDWARDS
Counsel to the Associate Attorney General

CHARLES E.T. ROBERTS
Senior Counsel to the Assistant Attorney General
Civil Division

JACQUELINE COLEMAN SNEAD
Deputy Director

*/s/ Pooja D. Majmundar*
POOJA D. MAJMUNDAR
DC Bar No. 1779930
Trial Attorney
U.S. Department of Justice, Civil Division
Enforcement & Affirmative Litigation Branch
P.O. Box 386
Washington, D.C. 20044-0386
(202) 598-0280
Pooja.D.Majmundar@usdoj.gov

*Attorneys for the United States of America*

**CERTIFICATE OF SERVICE**

I certify that on August 24, 2026, a true and correct copy of the foregoing Amended Complaint was filed electronically via the Court's CM/ECF system and served via CM/ECF on all counsel of record.

*/s/ Pooja D. Majmundar*
POOJA D. MAJMUNDAR